## EVERETT MESSENGER AND OTHERS v. THE PENNSYLVANIA RAILROAD COMPANY.

An agreement by a railroad company to carry goods for certain persons, at a cheaper rate than they will carry under the same conditions for others, is void as creating an illegal preference.

In case. On demurrer to declaration.

The declaration sets out, (first and second counts,) that the plaintiffs were large shippers of live hogs from Chicago and Pittsburg to Jersey City, and that the defendants, in the city of New York, on the 1st of December, 1870, agreed with the plaintiffs, that if they would ship by them, they would, on and after January 1st, 1871, transport their hogs from Chicago and from Pittsburg, to Jersey City, at the regular rates, allowing them a drawback of twenty cents per hundred pounds upon all hogs shipped from Chicago, and ten cents per hundred upon those shipped from Pittsburg; and further, should the defendants, after January 1st, 1871, transport the same description of freight for others, between the same points, except seven parties named, at less than their

regular rates, or should allow such others a drawback, then they should allow the plaintiffs such further drawback as would bring their freights twenty cents per hundred and ten cents per hundred lower that the lowest.

The plaintiffs aver that they shipped twelve millions of pounds from Chicago, and a like amount from Pittsburg to Jersey City by the defendants' road; that they paid the regular rates, and have received the twenty cents and ten cents drawback, but the defendants, during the same year, carried for other parties than those excepted in the contract, allowing such parties the same drawback, or making a reduction in the rates equal to the drawback, whereby the plaintiffs became entitled to have a further drawback of twenty cents and ten cents per hundred.

The third and fourth counts set out like contracts, with like exceptions, by which the defendants agree to pay drawbacks equal to twenty cents and ten cents from the regular rates; and further, that if either the defendants, the New York Central Railroad Company, or the Erie Railway Company, should rebate for other parties from the regular rates, or should give them drawbacks, then the defendants should allow the plaintiffs such further drawbacks as would make their rates twenty cents and ten cents lower that the lowest.

The fifth count sets out like contracts, made with the defendants, the New York Central Railroad Company and the Erie Railway Company, by which they severally agreed, for like shipments, to give the plaintiffs like drawbacks, and with the same exception as to other parties, to make the drawbacks twenty cents and ten cents per hundred lower than the lowest.

Argued at June Term, 1873, before BEASLEY, Chief Justice, and Justices DEPUE and VAN SYCKEL.

For the defendants, *I. W. Scudder.*

For the plaintiffs, *J. Linn.*

Messenger et al. v. Pennsylvania R. R. Co.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The Pennsylvania Railroad Company, who are the defendants in this action, agreed with the plaintiffs to carry certain merchandise for them, between certain termini, at a fixed rate less than they should carry between the same points for any other person. The allegation is, that goods have been carried for other parties at a certain rate below what the goods of the plaintiffs have been carried, and this suit is to enforce the foregoing stipulation. The question is, whether the agreement thus forming the foundation of the suit is legal.

There can be no doubt that an agreement of this kind is calculated to give an important advantage to one dealer over other dealers, and it is equally clear, that if the power to make the present engagement exists, many branches of business are at the mercy of these companies. A merchant who can transport his wares to market at a less cost than his rivals, will soon acquire, by underselling them, a practical monopoly of the business; and it is obvious, that this result can often be brought about if the rule is, as the plaintiffs contend that it is, that these bargains giving preferences can be made. A railroad is not, in general, subject to much competition in the business between its termini; the difficulty in getting a charter and the immense expense in building and equipping a road, leaves it, in the main, without a rival in the field of its operation; and the consequence is, the trader who can transmit his merchandise over it on terms more favorable than others can obtain, is in a fair way of ruling the market. The tendency of such compacts is adverse to the public welfare, which is materially dependent on commercial competition and the absence of monopolies. Consequently, the inquiry is of moment, whether such compacts may be made. I have examined the cases, and none that I have seen is, in all respects, in point, so that the problem is to be solved by a recurrence to the general principles of the law.

The defendants are common carriers, and it is contended

that bailees of that character cannot give a preference in the exercise of their calling, to one dealer over another. It cannot be denied, that at the common law, every person, under identical conditions, had an equal right to the services of their commercial agents. It was one of the primary obligations of the common carrier to receive and carry all goods offered for transportion, upon receiving a reasonable hire. If he refused the offer of such goods, he was liable to an action, unless he could show a reasonable ground for his refusal. Thus, in the very foundation and substance of the business, there was inherent a rule which excluded a preference of one consignor of goods over another. The duty to receive and carry was due to every member of the community, and in an equal measure to each. Nothing can be clearer than that under the prevalence of this principle, a common carrier could not agree to carry one man's goods in preference to those of another.

It is important to remark, that this obligation of this class of bailees is always said to arise out of the character of the business. Sir William Jones, importing the expression from the older reports, declares that this, as well as the other peculiar responsibilities of the common carrier, is founded in the consideration that the calling is a public employment. Indeed, the compulsion to serve all that apply could be justified in no other way, as the right to accept or reject an offer of business is necessarily incident to all private traffic.

Recognizing this as the settled doctrine, I am not able to see how it can be admissible for a common carrier to demand a different hire from various persons for an identical kind of service, under identical conditions. Such partiality is legitimate in private business, but how can it square with the obligations of a public employment? A person having a public duty to discharge, is undoubtedly bound to exercise such office for the equal benefit of all, and, therefore, to permit the common carrier to charge various prices, according to the person with whom he deals, for the same services, is to forget that he owes a duty to the community. If he exacts differ-

ent rates for the carriage of goods of the same kind, between the same points, he violates, as plainly, though it may be not in the same degree, the principle of public policy which, in his own dispute, converts his business into a public employment. The law that forbids him to make any discrimination in favor of the goods of A over the goods of B, when the goods of both are tendered for carriage, must, it seems to me, necessarily forbid any discrimination with respect to the rate of pay for the carriage. I can see no reason why, under legal rules, perfect equality to all persons should be exacted in the dealings of the common carrier, except with regard to the amount of compensation for his services. The rule that the carrier shall receive all the goods tendered, loses half its value, as a politic regulation, if the cost of transportation can be graduated by special agreement so as to favor one party at the expense of others. Nor would this defect in the law, if it existed, be remedied by the principle which compels the carrier to take a reasonable hire for his labor, because, if the rate charged by him to one person might be deemed reasonable, by charging a lesser price to another for similar services, he disturbs that equality of rights among his employers which it is the endeavor of the law to effect. Indeed, when a charge is made to one person, and a lesser charge, for precisely the same offices, to another, I think it should be held that the higher charge is not reasonable; a presumption which would cut up by the roots the present agreement, as, by the operation of this rule, it would be a promise founded on the supposition that some other person is to be charged more than the law warrants.

From these considerations, it seems to me, that testing the duties of this class of bailees by the standard of the ancient principles of the law, the agreement now under examination cannot be sanctioned. This is the sense in which Mr. Smith understands the common law rule. In his *Leading Cases, p.* 174, speaking of the liabilities of carriers, he says: " The hire charged must be no more than a reasonable remuneration to the carrier, and, consequently, not more to one (though a

rival carrier) than to another, for the same service." I am aware, that in the case of *Baxendale* v. *The Eastern Counties Railway*, 4 *C. B.* (*N. S.*) 81, this definition of the common law rule was criticised by one of the judges, but the subject was not important in that case, and was not discussed, and the expression of opinion with respect to it was entirely cursory. Indeed, the whole question has become of no moment in the English law, as the subject is specifically regulated by the statute, 17 *and* 18 *Vict.*, *ch.* 31, which prohibits the giving " of any undue or unreasonable preference or advantage to, or in favor of any particular person or company, or any particular description of traffic, in any respect whatever." The date of this act is 1854, and since that time the decisions of the courts of Westminster have, when discussing this class of the responsibilities of common carriers, been devoted to its exposition. But the courts of Pennsylvania have repeatedly declared that this act was but declaratory of the doctrine of the common law. This was so held in the case of *Sanford* v. *The Catawissa, Williamsport and Erie Railroad Co.*, 24 *Penna.* 378, in which an agreement by a railway company to give an express company the exclusive right to carry goods in certain trains, was pronounced to be illegal. In a more recent decision, Mr. Justice Strong refers to this case with approval, and says that the special provisions which are sometimes inserted in railroad charters, in restraint of undue preferences, are " but declaratory of what the common law now is." This is the view which, for the reasons already given, I deem correct.

But even if this result could not be reached by fair induction from the ancient principles which regulate the relationship between this class of bailees and their employers, I should still be of opinion that we would be necessarily led to it by another consideration.

I have insisted that a common carrier was to be regarded, to some extent, at least, as clothed with a public capacity, and I now maintain, that even if this theory should be rejected, and thrown out of the argument, still the defendants

must be considered as invested with that attribute. In my opinion, a railroad company, constituted under statutory authority, is not only, by force of its inherent nature, a common carrier, as was held in the case of *Palmer* v. *Grand Junction Railway*, 4 *M. & W.* 749, but it becomes an agent of the public in consequence of the powers conferred upon it. A company of this kind is invested with important prerogative franchises, among which are the rights to build and use a railway, and to charge and take tolls and fares. These prerogatives are grants from the government, and public utility is the consideration for them. Although, in the hands of a private corporation, they are still sovereign franchises, and must be used and treated as such, they must be held in trust for the general good. If they had remained under the control of the state, it could not be pretended, that in the exercise of them, it would have been legitimate to favor one citizen at the expense of another. If a state should build and operate a railroad, the exclusion of everything like favoritism with respect to its use, would seem to be an obligation that could not be disregarded without violating natural equity and fundamental principles. And it seems to me impossible to concede, that when such rights as these are handed over, on public considerations, to a company of individuals, such rights lose their essential characteristics. I think they are, unalterably, parts of the supreme authority, and in whatsoever hands they may be found, they must be considered as such. In the use of such franchises, all citizens have an equal interest and equal rights, and all must, under the same circumstances, be treated alike. It cannot be supposed that it was the legislative intention, when such privileges were given, that they were to be used, as private property, at the discretion of the recipient, but, to the contrary of this, I think an implied condition attaches to such grants, that they are to be held as a *quasi* public trust for the benefit, at least to a considerable degree, of the entire community. In their very nature and constitution, as I view this question, these companies become, in certain aspects, public agents, and

the consequence is, they must, in the exercise of their calling, observe to all men a perfect impartiality. On these grounds, the contract now in suit. must be deemed illegal in the very particular on which a recovery is sought.

The result is, the defendants must have judgment on the demurrer.

CITED in *Union Locomotive and Express Co.* v. *Erie Railway Co.*, 8 *Vr.* 23.