THE STATE EX REL. THE LAUNDRY, INC., and OVERLAND LAUNDRY COMPANY v. PUBLIC SERVICE COMMISSION of State of Missouri ET AL., Appellants.—34 S. W. (2d) 37.

Division One, January 5, 1931.

94

*D. D. McDonald* and *J. P. Painter* for appellants.

*Roby Albin* for respondents.

96

SEDDON, C.—This is an appeal by the Public Service Commission of this State from a judgment of the Circuit Court of Cole County, made and entered on January 3, 1930, setting aside an order of the Public Service Commission, dated June 14, 1929, dismissing the complaint of The Laundry, Inc., and the Overland Laundry Company, both Missouri corporations, against the St. Louis County Water Company, a Missouri public utility corporation, filed with the Public Service Commission on December 20, 1928, and remanding the said proceeding to the Pubic Service Commission for further action.

The proceeding was instituted upon a written complaint filed with the Public Service Commission by the Maplewood Laundry Company and the Overland Laundry Company, both incorporated entities, which written complaint charged and alleged, in substance and effect, that the complainants are and were, at all times herein referred to, engaged in a general laundry business, washing, cleaning, starching and ironing clothes, clothing, textile fabrics, and all and every article made therefrom; that they are engaged in said business on a very large scale, by the use of a large number of hired employees, and by the use of a large amount of machinery and equipment, such as is usually and generally used by large industries and other establishments of an industrial and manufacturing nature; that they are further engaged in those businesses which are incidental to washing and cleaning clothing and laundering the same, such as gathering soiled, unwearable and unusable clothing and fabrics, cleaning, reclaiming, repairing and renewing the same, and delivering the same to their customers in the nature of clean and usable clothing and fabrics; that, in the conduct of complainants' said business, the

principal article, ingredient and material used is water, which is purchased by complainants from the St. Louis County Water Company; that complainants have been charged by the St. Louis County Water Company for said water so used, and are now being charged for said water so being used, at meter rates, which rates are the same as are charged individual users and consumers; that complainants have paid such water charges and rates under protest, for the reason that said St. Louis County Water Company has threatened to discontinue the supply of water furnished to complainants in the event that water is not paid for by complainants at the same meter rates as are charged individual consumers; that complainants use and have used, in carrying on their business, an amount of water in excess of 500,000 gallons per month, which water is purchased from the St. Louis County Water Company; that there is, and has been, in force and effect, within and for St. Louis County, a schedule of rates for water, which became effective on April 1, 1924, providing certain rates for water for industrial establishments, known as "manufacturers' rates," and which provide that consumption of water for manufacturing purposes amounting to 500,000 gallons per month shall be at the rate of fifteen cents per thousand gallons, with a discount of ten per cent for cash paid in ten days; that complainants have made application to the said St. Louis County Water Company for the said "manufacturers' rates," but the said Water Company has failed and refused to extend to complainants the said "manufacturers' rates;" that by extending said "manufacturers' rates" to certain users and consumers of water, and by withholding such rates from complainants, who use the same or larger amounts of water, sufficient to come within said class and schedule of rates, there results an unjust and unfair discrimination against complainants, which is illegal and unfair to complainants.

The relief sought by complainants, as prayed in their complaint, is that the Public Service Commission "make investigation of the facts and matters set forth herein, and determine that the said manufacturers' rates shall be available to the petitioners (complainants), and for an order upon the said St. Louis County Water Company to extend to the petitioners the said manufacturers' rates, and to sell and to supply to petitioners water on said basis and at said rate and upon said conditions; and that the said St. Louis County Water Company account to the petitioners for the moneys which petitioners have been compelled to pay under protest since April 1, 1924, and to refund to the petitioners the amounts paid, together with interest, in excess of the amount which petitioners should have paid had they been classified as manufacturers, and had they been extended the said manufacturers' rates; and the petitioners pray for such other and

further relief in the premises as to the Public Service Commission may seem meet and proper."

In due time, and after proper notice to the St. Louis County Water Company, a hearing upon said complaint was had before the Public Service Commission at its principal office in Jefferson City, Cole County, Missouri, at which hearing the complainants and the St. Louis County Water Company appeared by counsel, and evidence was offered by the respective parties in support of, and in opposition to, the written complaint so filed. At such hearing, it appearing that The Laundry, Inc., a Missouri corporation, had succeeded to the corporate business, rights and franchises of the Maplewood Laundry Company, the successor corporation was substituted as a complainant in the place and stead of Maplewood Laundry Company.

The evidence adduced upon the hearing before the Public Service Commission developed the following facts:

Since March 13, 1924, and effective from and after that date, there has been on file with the Public Service Commission a schedule of rates, filed by the St. Louis County Water Company, and ordered and approved by the Commission, for the furnishing of water to consumers "residing in incorporated cities and towns entering into franchise contracts with the company for water and fire service for periods of twenty years," which schedule of rates is as follows:

"Use in Gallons per Quarter. — Per M.

| | | |
|---|---|---|
| 0 to 3,000 (first) | 3,000 gal. | 48¾c |
| 3,000 to 9,000 (next) | 6,000 gal. | 45c |
| 9,000 to 36,000 (next) | 27,000 gal. | 37½c |
| 36,000 to 225,000 (next) | 189,000 gal. | 30c |
| 225,000 to 600,000 (next) | 375,000 gal. | 22½c |
| All over 600,000 | | 18c" |

The plant and place of business of The Laundry, Inc., being located in the city of Maplewood, an incorporated city in St. Louis County, the said laundry corporation has been charged by the St. Louis County Water Company for all water consumed according to the aforestated schedule of rates.

A schedule of rates, filed by the St. Louis County Water Company with the Public Service Commission, and ordered and approved by the Commission, effective from and after March 13, 1924, for the furnishing of water to consumers in unincorporated communities "where there are no franchise contracts for water and fire hydrant service," is as follows:

"Use in Gallons per Quarter. — Per M.

| | | |
|---|---|---|
| 0 to 3,000 (first) | 3,000 gal. | 65c |
| 3,000 to 9,000 (next) | 6,000 gal. | 60c |
| 9,000 to 36,000 (next) | 27,000 gal. | 50c |
| 36,000 to 225,000 (next) | 189,000 gal. | 40c |

225,000 to 600,000 (next) ..............375,000 gal.......30c
All over 600,000 ......................................20c"

The plant and place of business of the Overland Laundry Company being located in Overland, an unincorporated community in St. Louis County, the said laundry corporation has been charged by the St. Louis County Water Company for all water consumed according to the latter schedule of rates.

There is also on file with the Public Service Commission a schedule of rates, denominated "Manufacturers' Rates," filed by the St. Louis County Water Company, and ordered and approved by the Commission, dated March 13, 1924, and effective from and after that date, and which schedule is a restatement of the "manufacturers' rate" as it has existed in St. Louis County since the year 1910, as follows:

"Consumption for manufacturing purposes, amounting to 500,-000 gallons per month, shall be at the rate of 15 cents per 1,000 gallons, with a discount of 10 per cent for cash in ten days."

The evidence shows that the St. Louis County Water Company has extended the "manufacturers' rate" to ten of its customers, or consumers of water, each of which customers employs a number of persons in the conduct and operation of its business, which is that of converting, or manufacturing, raw materials into finished commercial products. There is no positive evidence as to the number of persons employed by each of said ten customers enjoying the "manufacturers' rate," but the evidence shows that at least one of such customers was employing about thirty men at the time of the hearing. The reason for the "manufacturers' rate" was thus explained by an executive officer of the St. Louis County Water Company at the hearing: "The only reason for that rate was to put into effect (such rate) at a time that it was necessary to get a volume of business and a number of consumers in the county, if the (Water) Company was going to be able to continue to operate. . . . The excuse for making that rate was that these (manufacturing) concerns each employed several hundred men, and these men would, at that time or shortly after that time, come to the county to live and build homes and live out in the county, and that would bring the volume of business to the Company very greatly in excess of the amount of water taken by the manufacturing concerns themselves, and these household consumers taking water at the block (or meter) schedule would pay the maximum rate for water, since they pay the highest rate of the block (meter) schedule, and, added to the manufacturers' rate or the amount of money received from the manufacturers, it would make up the loss, and possibly produce a profit on the total business."

The chief executive officer of the St. Louis County Water Company testified that the "manufacturers' rate" of fifteen cents per thousand gallons of water, with a reduction of ten per cent if paid in cash within ten days from the date of billing, makes the net rate charged the consumer enjoying the "manufacturers' rate" amount to the sum of thirteen and one-half cents per thousand gallons, which rate is less than the actual cost of production; that the cost of production, or operating expense, of the St. Louis County Water Company, based upon the aggregate amount of water sold to all consumers in the year 1925, was 22.26 cents per thousand gallons; that the cost of production, or operating expenses, in the year 1926 was 18.7 cents per thousand gallons; and that the production cost of water furnished by the Water Company and sold in the year 1927 was 21.59 cents per thousand gallons.

Evidence was adduced by the Water Company that the city of Webster Groves used 301,763,000 gallons of water for municipal purposes in the year 1928, for which the municipality paid to the Water Company a meter rate of twenty-one and one-half cents per thousand gallons; that the eleemosynary institutions situate in St. Louis County used 301,000,000 gallons of water in the year 1928, or approximately 25,000,000 gallons per month, for which such eleemosynary institutions paid the Water Company, under orders of the Public Service Commission, a meter rate of twenty-one and one-half cents per thousand gallons, which rate was approximately the production cost to the Water Company, without allowance for interest or other investment charges; that The Laundry, Inc., paid to the Water Company in the year 1928 an average rate, based upon the existing schedule of rates applicable to the individual consumer in incorporated cities and towns, of 19.47 cents per thousand gallons of water used; and that the Overland Laundry Company paid to the Water Company in the year 1928 an average rate, based upon the existing schedule of rates applicable to the individual consumer in unincorporated communities, of twenty-six cents per thousand gallons of water used.

The evidence further tended to show that each complainant Laundry Company was using, and had been using for some time prior to the filing of their complaint, in excess of 500,000 gallons of water per month; that they were billed and charged by the Water Company for water used on the basis of the existing schedule of rates applicable to the individual consumer of water, and not upon the existing schedule of rates denominated "manufacturers' rate;" that each of the complainants had made application to the Water Company to be placed under the schedule "manufacturers' rate," but that the Water Company had refused to so classify complainants; that the water purchased by complainants was used for drinking,

sanitary purposes, the manufacture of steam power, and for washing or laundering clothing and other fabrics; that the much greater part of all water used by complainants was used for laundering clothing; that The Laundry, Inc., employs an average of 89 employees, consisting of 17 men and 72 women, 32 of which employees reside within the territory served by the St. Louis County Water Company; and that the Overland Laundry Company employs an average of 43 employees, about 75 per cent of which number are women, and the balance are men, all of which employees reside in St. Louis County and in the vicinity of the laundry plant.

The evidence further shows that the laundry plants of complainants are operated daily, except Sunday, during the usual and ordinary hours of the business day, between the hours of 7:30 o'clock in the morning and five o'clock in the evening; and that water is used uniformly throughout those hours of operation, that is to say, the amount or quantity of water used is uniform for each hour of the business day during which complainants' laundry plants are in operation. There is no evidence herein that the Water Company is required, by reason of the nature and necessities of the complainants' business, to furnish and deliver water to complainants at unusual hours of the day, or in unusual or in variable quantities, or under different pressure, or under operative conditions other than the Water Company furnishes and delivers water to those users and consumers enjoying the benefit of the "manufacturers' rate."

On June 14, 1929, a written report or decision was made and filed by the Public Service Commission, wherein the Commission reached the conclusion that "the complainants herein are not entitled to be classified as manufacturers, and that the complaint should be dismissed." It was therefore ordered of record by the Commission "that the complaint of The Laundry, Inc., and the Overland Laundry Company against the St. Louis County Water Company be and the same is hereby dismissed."

In due time, the complainants filed with the Public Service Commission a written application for a rehearing, setting forth specifically the grounds upon which the complainants deem the decision and order of the Commission to be unlawful, unjust and unreasonable. On June 28, 1929, the Commission made and entered of record an order overruling and denying complainants' application for a rehearing. Thereafter, and in due time, the complainants applied to the Circuit Court of Cole County for a writ of certiorari or review, which writ was duly granted by the Circuit Court of Cole County. The proceeding was duly heard by the Circuit Court of Cole County, upon the record and evidence as certified by the Public Service Commission, whereupon the Circuit Court of Cole County, on January

3, 1930, made and entered the following judgment: "The order of the Public Service Commission in refusing to permit the (complaining) laundry companies to be classified under the class of manufacturers is hereby set aside, and the cause is remanded to the Commission for further proceedings, the opinion of the court being that the (complaining) laundries, under the law, should be placed in the classification with manufacturers."

After an unavailing motion for a new trial, the Public Service Commission was granted an appeal to this court from the judgment of the circuit court.

The single issue, or question, involved in the instant proceeding is thus clearly and pointedly stated by complainants' counsel at the hearing before the Public Service Commission: "I represent two laundries in St. Louis County, the Overland Laundry Company, which is incorporated, and The Laundry, Inc., also a corporation, and successor to the Maplewood Laundry Company. These laundries admittedly use more than 500,000 gallons of water per month, but they, however, have been billed at the rate of the ordinary consumer, and it is our contention that these laundries, being industrial enterprises and carrying on a business in which they use large quantities of water for industrial purposes, should be classified as manufacturers under this provision of the (scheduled) rates so as to receive the manufacturers' rate."

The position contended for by the St. Louis County Water Company in opposing the complaint is thus clearly stated by its chief executive officer at the hearing before the Public Service Commission: "The rate asked for by the laundries, the manufacturers' rate, has been in force and effect for a considerable number of years; in fact, the time dates back to the time when the Water Company was still operating at a deficit, without profit on its operations, and to the time when it was necessary to get a volume of business to continue in operation. This rate, referred to as the manufacturers' rate, was not intended, and never has been, and was never intended to be, an industrial rate, but only a manufacturers' rate, for the particular purpose to build up the sales of the Water Company to the volume that would eventually make the operations of the Company profitable. The rate was put into effect to induce the Wagner Electric Manufacturing Company and the Fulton Iron Works Company to locate their plants in St. Louis County and take water from this Company, with the idea that the manufacturer employs hundreds of men and would bring sufficient business with it, which, paid for at the highest rate of the block (meter) schedule, would give a large volume of business; so that, while there was no profit in the manufacturers' rate, or profit on the water sold to the manufacturers, the other business brought to the Water Company, by reason of

the location of the manufacturing plants in the county, would eventually make it a paying proposition. At the time it (the manufacturers' rate) was put into effect it wasn't a paying (profitable) rate, but it was hoped that it would eventually come to the point that, if there was no profit, there would at least be no loss on these sales; but the war intervened, and raised the cost of operations, so at no time has the sale of water at the net price of 13½ cents per thousand gallons been a profitable sale to the Water Company, for which reason the Company has been rather slow to extend this manufacturers' rate, or to call it an industrial rate, since it was not put into effect, and never considered in administering it, as an industrial rate. The costs of the Water Company, as shown by the operating expenses of the Company for the years that the reports are on file in the office of this Commission, showing the cost of operating, are very much in excess of the 13½ cents (net) per thousand gallons received for the sales of water, without any allowance whatever for return on the investment.''

As we view the written complaint of the two laundry corporations, filed with the Public Service Commission as the basis and foundation of this proceeding, it is not a complaint ''as to . . . the purity, pressure or *price* of water,'' within the provisions and meaning of Section 10490, Revised Statutes 1919; or is the complaint one ''as to the *reasonableness* of any rates or charges of any . . . *water* . . . *corporation*,'' within the provisions and meaning of Section 10518, Revised Statutes 1919. The complainants are not complaining against the *price* of water, as such price has been fixed and established by the various schedules of rates filed by the Water Company and approved by the Public Service Commission; or are the complainants challenging the *reasonableness* of any such rates or charges of the Water Company as fixed and established by the various schedules of rates on file with the Public Service Commission. Hence, the written complaint herein is not such as must be signed by ''not less than twenty-five consumers or purchasers, or prospective consumers or purchasers, of water,'' in order to be entertained by the Public Service Commission, and in order to confer jurisdiction of the complaint in the Commission within the requirements of the aforecited sections of the statute, known as the Public Service Commission Law. Rather do we view the complaint herein as one over which the Public Service Commission properly has jurisdiction by virtue of the first clause of Section 10518, Revised Statutes 1919, which provides: ''Complaint may be made . . . by *any* (i. e., by one, or by more than one) corporation or person . . . by petition or complaint in writing, setting forth any act or thing done or omitted to be done by any corporation, person or public utility, including any rule, regulation or charge heretofore established or fixed by or for any

corporation, person or public utility in violation, or claimed to be in violation, of any provision of law, . . ." [Parentheses and italics ours.] The gist and gravamen of the complaint filed herein is that the St. Louis County Water Company, by its failure and refusal to classify the complainants as manufacturers, or rather to extend to complainants the scheduled "manufacturers' rates," has thereby wrongfully, unlawfully, unjustly and unreasonably discriminated against complainants, in favor of other consumers and users of water who are similarly situated, under a regulation or charge theretofore established or fixed by the St. Louis County Water Company, in violation of a rule of the common law, and of the statutory law of this State. Such was unquestionably the view of the Public Service Commission, inasmuch as the decision or opinion of the Commission clearly indicates that the Commission did not dismiss the complaint for want of jurisdiction thereover, or because of insufficiency in the number of complainants, or in the number of the signers of the written complaint, but for the expressed and single reason that "the Commission is of the opinion that the complainants herein are not entitled to be classified as manufacturers." The action of the Public Service Commission in retaining and exercising jurisdiction over the complaint filed herein is in entire accord with previous announcements and rulings of the Commission upon the subject. [Cole v. Light, Heat, Water & Power Co., 1 Mo. P. S. C. 130, 139.] We are of the opinion that the Public Service Commission had jurisdiction over the complaint filed herein, and that, by reason of the derivative jurisdiction conferred upon this court by Section 10525, Revised Statutes 1919, the order of the Commission, and the judgment of the Circuit Court of Cole County, upon the single issue involved are properly reviewable by this court.

The Public Service Commission dismissed the complaint of the two laundry corporations herein because the Commission was of the opinion that the nature or function of complainants' business, which is that of laundering soiled clothing and fabrics, does not bring the complainants within the technical and precise definition of the term "manufacturing purposes," as such term is used in the schedule of rates denominated "Manufacturers' Rates," as filed by the St. Louis County Water Company and approved by the Public Service Commission. It is urged by the appellant, Public Service Commission that, "in the common understanding, the function of a laundry is to make clothes clean, rather than to make (i. e., *manufacture*) clean clothes," and that the business of a laundry is at most a mere service, and not in any sense a manufacturing process whereby raw or partly fashioned materials are completely or partly changed and converted into finished commercial products. The appellant, in support of its decision and order herein, cites a number of judicial decisions,

wherein courts of other and foreign jurisdictions have ruled that a laundry is not a manufacturing establishment. We have carefully read and analyzed each and all of the several juristic decisions cited by the appellant. Most, if not all, of the decisions cited by appellant involved the construction and application of a legislative act or statute, or of a constitutional provision which, by its precise language and terms, included "manufacturers," or "manufacturing establishments," but which did not include "laundries" by name or designation. Several of such cited decisions involved the construction and application of statutes, commonly called "anti-trust statutes," which are aimed at pools, trusts and conspiracies having for their purpose the restraint, control and combination of the business of manufacture and the sale of manufactured merchandise, and the consequent enhancement of the price of such manufactured merchandise to the ultimate purchaser or consumer. In all such decisions the courts have pointedly and expressly bottomed their decisions upon the ground that the statute under construction is highly penal, and as such must be strictly construed, so as not to include, by implication or by mere construction, a class of business, such as a laundry, not expressly mentioned in the legislative act. Other decisions cited by appellant involved the construction and application of the Federal Bankruptcy Act, which confers upon the Federal courts the jurisdiction to adjudicate corporations to be involuntary bankrupts only when they are "engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits," and wherein it was held that a laundry corporation, operating and conducting the usual and ordinary business of a laundry, does not fall within any of the prescribed classifications of the Bankruptcy Act. The ground of such decisions is bottomed upon the fact that the Bankruptcy Act purposes to take from the classified corporation, involuntarily and without its consent, all control over its corporate property and affairs, and hence such corporation must "be well defined in the law" in order to bring it within the provisions of the Bankruptcy Act; which is only another way of holding that the Bankruptcy Act must be given a strict, rather than a liberal construction, and unless the business of a laundry corporation clearly and certainly brings it within the prescribed classifications of the Bankruptcy Act, the courts have no jurisdiction to adjudicate a laundry corporation to be an involuntary bankrupt. Other decisions cited by appellant involved the construction and application of statutes exempting manufacturing corporations from taxation, or statutes which give to employees of any manufacturing corporation or establishment a paramount lien for their labor and services against and upon the property of such manufacturing corporation or establishment used in the conduct of its business, or constitutional or statutory provisions exempting manufacturing and me-

chanical corporations from corporate stock liability. It is the general and universal holding of the courts that such statutes or constitutional provisions must be given a strict construction, so as to include only such corporations as are expressly and specifically mentioned therein. None of the judicial decisions cited by appellant involved statutes prescribing or regulating the rates to be charged by public utility corporations, or construed the applicability of rate schedules filed by public utility corporations with public officers or administrative commissions, pursuant to the requirements of legislative enactments relating to public utilities.

Unlike the character and nature of the various statutes and constitutional provisions involved in the several decisions cited by appellant, the Public Service Commission Law of our own State has been uniformly held and recognized by this court to be a remedial statute, which is bottomed on, and is referable to, the police power of the State, and under well-settled legal principles, as well as by reason of the precise language of the Public Service Commission Act itself, is to be "liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities." [Sec. 10538, R. S. 1919; State ex rel. v. Public Service Commission, 275 Mo. 201, 206; State ex inf. v. Gas Co., 254 Mo. 515, 535.] The rule of liberal construction thus uniformly accorded by this court to the Public Service Commission Law is consonant with the universal rule applicable to similar remedial statutes, which is to the effect that "laws enacted in the interest of the public welfare or convenience should be liberally construed with a view to promote the object in the mind of the Legislature, by suppressing the mischiefs and advancing the remedy." [36 Cyc. 1173-1175.]

The Public Service Commission is an administrative agency or committee of the Legislature, and as such is vested with only such powers as are conferred upon it by the Public Service Commission Law, by which it was created. [Railway Co. v. Public Service Comm. (Mo. Sup.), 192 S. W. 460, 462; Lusk v. Atkinson, 268 Mo. 109, 116; Public Service Comm. v. Railway Co., 301 Mo. 157, 165; State ex rel. v. Public Service Comm., 308 Mo. 359, 372.] Among the various powers conferred upon the Public Service Commission by the Public Service Commission Law of our State is the "power to require every . . . water corporation . . . to file with the commission and to print and keep open to public inspection schedules showing all rates and charges made, established or enforced or to be charged or enforced." [Sec. 10478, par. 12, R. S. 1919.] Pursuant thereto the St. Louis County Water Company filed with the Public Service Commission, and the Public Service Commission ordered and approved, certain schedules of rates, among them the schedule de-

nominated "Manufacturers' Rates," which prescribed or fixed a flat rate of 15 cents per thousand gallons, with a discount of ten per cent for cash paid in ten days, where consumption of water for manufacturing purposes amounted to 500,000 gallons per month. Upon the filing of such rate schedule by the Water Company, and its approval by the Public Service Commission, the schedule became the equivalent of a legislative enactment or law prescribing and fixing the rate for water furnished by the St. Louis County Water Company and used or consumed for manufacturing purposes in the minimum quantity of at least 500,000 gallons per month. The Public Service Commission, by its decision and order made and entered of record herein, has given a strict and narrow construction to the term "manufacturing purposes" as used in such rate schedule, so as to exclude the complainants from the enjoyment and benefit of the rate prescribed therein, because (the Public Service Commission opines) complainants' laundry business does not fall technically within the category of a manufacturing establishment. We are of the opinion that the construction given to such so-called manufacturers' rate schedule by the Public Service Commission is too narrow, and that such manufacturers' rate schedule should be given a liberal, rather than a strict, construction, bearing in mind that legislative enactments prescribing and fixing rates to be charged for public utilities, or which empower an administrative agency or commission of the Legislature to prescribe and fix such rates, being referable to the police power of the State, and being enacted in the interest of the public welfare or convenience, are highly remedial, and therefore are to be liberally construed so as to promote the object in the mind of the Legislature.

Since the regulation and fixing of rates or charges for public utilities, and the classification of the users or consumers to whom such rates or charges shall be applicable, is primarily a legislative function, it follows that the Public Service Commission, which is purely and simply an administrative agency or arm of the Legislature, is exercising a legislative or quasi-legislative function in the performance of those powers which have been conferred upon it by the Public Service Commission Law, among which are the powers to regulate and fix rates or charges for public utilities, and to classify those users or consumers to whom such rates or charges shall be applicable. Such classification, in order to be valid, must comport with the rule or principle of sound legislative classification. The rule is thus clearly stated by this court, en banc, in State ex inf. v. Hedrick, 294 Mo. 21, 74: "The basis of sound legislative classification is similarity of situation or condition with respect to the feature which renders the law appropriate and applicable. A law may not include less than all who are similarly situated. If it

does, it is special and, therefore, invalid, because it omits a part of those which in the nature of things the reason of the law includes. The question is not whether, considering all the circumstances which exist, the Legislature might not constitutionally make a law which would include a larger class. On the contrary, it is whether it appears beyond a reasonable doubt that there are no distinctive circumstances appertaining to the class with respect to which it has legislated which reasonably justify its action in restricting the operation of the law to the persons, objects or places to which the law is made applicable.''

Again, in Ex parte French, 285 S. W. 513, 515, this court, en banc, thus announced the rule of legislative classification: ''A classification for legislative purposes must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed. It cannot be an arbitrary classification. The Legislature may pass laws applicable to a particular class of individuals, but such laws must bear equally upon all individuals coming naturally within the class. The Legislature may not classify by characteristics or qualities which might distinguish individuals unless that distinction applies to the particular matter under consideration.''

It is significant that, in enacting the Public Service Commission Law, the Legislature (apparently having in mind the aforestated rule or principle of sound legislative classification) put into the Public Service Commission Law the following express provisions and requirements: ''No . . . water corporation or municipality shall directly or indirectly by any special rate, . . . or other device or method, charge, demand, collect or receive from any person or corporation a greater or less compensation for . . . water, or for any service rendered or to be rendered or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions.'' And, further: ''No . . . water corporation or municipality shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.'' [Sec. 10477 (2, 3), R. S. 1919.]

The Public Service Commission of this State had a somewhat similar question to deal with and determine upon the complaint of the Civic League of St. Louis et al. v. City of St. Louis, 4 Mo. P. S. C. 412, wherein complaint was made against a schedule of

water rates filed with the Commission by the City of St. Louis, acting in its private or proprietary capacity as the owner of a municipal water plant, and as a distributor of water to users and consumers within the municipality. The schedule of rates therein complained against provided a different and less rate or charge for water used "for purely manufacturing purposes" than the rate charged for general use. The municipality sought to justify the so-called manufacturers' rate upon the ground that such rate was established to encourage the location of manufacturing plants within the city of St. Louis. The Public Service Commission found and held that the manufacturers' rate was discriminatory, and that the classification provided by the rate schedule was unreasonable and unjust. The opinion or decision of the Public Service Commission was written by Commissioner Eugene McQuillin, an eminent Missouri lawyer and a distinguished textwriter on a wide variety of legal subjects, who said in the course of the opinion: "In the Missouri act (Pubic Service Commission Law) supervision and regulation seek to require all public utilities operating in the State, whether owned by private persons, corporations or municipalities, not only to serve the public at reasonable rates or charges, but to require them also to serve the public efficiently and without unjust discrimination. The concensus of opinion everywhere is that such requirements are imperatively demanded by modern industrial conditions. Of course, as observed by the Supreme Court of the United States in a leading case, such equality of rights does not prevent differences in the modes and kinds of service and different charges based thereon. [Western Union Tel. Co. v. Call Pub. Co., 181 U. S. 92, 100.] In brief, in charges for service or in rate-making, reasonable classification may be adopted. . . . However, laws designed to enforce equality of service and charges and prevent unjust discrimination, as the Missouri act, require the same charge for doing a like and contemporaneous service (e. g., supplying water) under the same or substantially similar circumstances or conditions. To impart this idea more completely or to amplify, our law in express terms forbids granting undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subjecting any person, corporation, or locality, or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. [P. S. C. Law, art. IV, sec. 68.] In brief, rates or charges to be valid must not be unjust, unreasonable, unjustly discriminatory, or unduly preferential. Our statute demands reasonable and non-discriminatory rates . . . . Accordingly, even at common law, it is not admissible for a public service company to demand a different rate, charge or hire from various persons for an

identical kind of service under identical conditions. Such partiality cannot square with the obligations of public employment. The public duty must be discharged for the equal benefit of all, and obviously to permit discrimination or inequality in the service or charges is to ignore the public obligation. [Messenger v. Pacific Railroad Co., 36 N. J. L. 407, 37 N. J. L. 531.] The common right of all involves the obligation to give equal rights to all for the same service. [Fitzgerald & Co. v. Grand Trunk Railroad Co., 63 Vt. 169, 22 Atl. 76.] The services must be open to all on equal terms. Discrimination is opposed to sound public policy. [Schofield v. Railway Co., 43 Ohio St. 571, 3 N. E. 907.] The common law today forbids all discrimination between two applicants who ask the same service. [2 Wyman, Public Service Corporations, sec. 1290.] . . . Thus the principle of equality designed to be enforced by legislation and judicial decision forbids any difference in charge which is not based upon difference of service and even when based upon difference of service must have some reasonable relation to the amount of difference, and cannot be so great as to produce unjust discrimination. [Western Union Telegraph Co. v. Call Pub. Co., 181 U. S. 92, 100, 103.] . . . While the principles of the common law are operative, except so far as they have been modified by constitution or legislation (R. S. 1909, sec. 8047; Duke v. Harper, 66 Mo. 51; Reaume v. Chambers, 22 Mo. 36; Lindell v. McNair, 4 Mo. 380), whatever may have been the common law rule relating to unjust discrimination, our legislation now controls and is to be construed and applied according to its spirit in the light of the unsatisfactory conditions prevailing with respect to the service and rates of public utilities . . . prior to its enactment. . . . The Commission has had occasion to consider carefully the policy of the law relating to discrimination in rates on the part of the public service companies of various kinds, and has held invariably that any inequality of service or charges and unjust discriminations in whatever form practiced fall within the condemnation of the Public Service Commission Act; that all unjust discriminations respecting rates or charges are in violation of public duty, contrary to the common law, and against sound public policy; and that statutes forbidding unjust discriminations of whatever character are merely declaratory of the common-law rule which is founded on public policy and requires one engaged in a public calling to charge a reasonable and uniform price or rate to all persons for the same service rendered under the same or substantially similar circumstances or conditions . . . . Our conclusion, therefore, is that the schedule of rates providing a less charge for water for purely manufacturing purposes than for general use, is plainly unjust discrimination under the well settled

rule of the common law, as well as under the Public Service Commission Act, which is merely declaratory of the common law rule, because it distinctly appears that the classification therein is unreasonable and unjust.''

Speaking to the subject of unjust discrimination by public utility corporations in respect to rates and service, the United States Supreme Court, through Mr. Justice BREWER, thus announced in Western Union Telegraph Co. v. Call Pub. Co., 181 U. S. 92, 100: ''All individuals have equal rights both in respect to service and charges. Of course, such equality of right does not prevent differences in the modes and kinds of service and different charges based thereon. There is no cast-iron line of uniformity which prevents a charge from being above or below a particular sum, or requires that the service shall be exactly along the same lines. But that principle of equality does forbid any difference in charge which is not based upon difference in service, and even when based upon difference of service, must have some reasonable relation to the amount of difference, and cannot be so great as to produce an unjust discrimination.''

It is indisputable under the evidence herein, as adduced at the hearing of the complaint before the Public Service Commission, that there is no dissimilarity or difference in the service of furnishing and supplying water to the ten customers of the Water Company who enjoy the benefit of the rate schedule denominated ''Manufacturers' Rates'' and the service of furnishing and supplying water to the complainants herein. The sole reason or ground suggested by the Water Company in justification of the manufacturers' rate schedule, and in justification of the single and select classification of water users ʼclaimed to be made thereby, is that manufacturing establishments ordinarily employ a considerable number of employees, who are likely to be or to become customers of the Water Company as individual users of water furnished by the Water Company under the schedules of rates applicable to the domestic, or household, customer and user of water. Such a classification of water users obviously has no reasonable foundation bottomed upon any dissimilarity or difference in service or operative conditions, but rests solely upon a possible pecuniary advantage to the Water Company in which the various customers and patrons of the Water Company, at most, are only indirectly and remotely concerned. Furthermore, it would seem to appear under all the evidence herein that, upon the single reason or ground of classification asserted by the Water Company, the complainants, as the employers of a considerable number of individuals who are likely to be or to become users and consumers of water furnished by the Water Company, stand upon as favorable a footing as do other employers of labor who enjoy, and to whom is extended,

the benefit of the so-called manufacturers' rate schedule. It therefore appears to our minds that the strict construction and application given to the manufacturers' rate schedule by the Public Service Commission necessarily results in an unjust and unfair discrimination against the complainants herein, who are users of water under the same or substantially similar and contemporaneous service conditions as are applicable to those users of water enjoying the benefit of the manufacturers' rate schedule, in contravention of both the letter and the spirit of the Public Service Commission Law, which is merely declarative of the rule of the common law bearing upon the subject of unjust discrimination in rates and service. The judgment of the Circuit Court of Cole County, setting aside the order of the Public Service Commission herein and remanding the proceeding to the Commission for further action, was right, and therefore must be affirmed.

It is observable, in passing, that the complainants herein pray the Public Service Commission to order and require the St. Louis County Water Company to account to complainants for the moneys in excess of the manufacturers' rate which complainants, under protest, have been compelled to pay to the Water Company since April 1, 1924, and to refund to the complainants the excess moneys so paid, together with interest thereon. The pecuniary relief so prayed by complainants calls for the exercise of a judicial function, by the entry of a judgment or order for the recovery of money, which function is exclusively exercisable only by the judicial branch or department of our state government. The Public Service Commission is an administrative body only, and not a court, and hence the Commission has no power to exercise or perform a judicial function, or to promulgate an order requiring a pecuniary reparation or refund. [Lusk v. Atkinson, 268 Mo. 109, 116; State ex rel. v. Public Service Commission, 303 Mo. 212, 219; State ex rel. v. Public Service Comm., 19 S. W. (2d) 484, 486.] It therefore follows that the Public Service Commission has no power or authority to determine or to award the pecuniary relief prayed by complainants herein.

For the reasons above stated, the judgment of the Circuit Court of Cole County herein must be affirmed, and it is so ordered. *Ellison* and *Ferguson, CC.*, concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.