**DE PAUL HOSPITAL SCHOOL OF NURSING, INC., a corporation, Plaintiff-Respondent,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, a corporation, Defendant-Appellant.**

No. 36058.

Missouri Court of Appeals, St. Louis District, Division One.

May 4, 1976.

Motion for Rehearing or Transfer to Court En Banc or Transfer to Supreme Court Denied June 15, 1976.

Application to Transfer Denied Sept. 13, 1976.

Coburn, Croft, Shepherd & Herzog, John R. McFarland, William C. Sullivan, St. Louis, James E. Taylor, Kansas City, for defendant-appellant.

Anderson, Gilbert, Wolfort, Allen & Bierman, Norman Bierman, St. Louis, for plaintiff-respondent.

RENDLEN, Judge.

Southwestern Bell Telephone Company appeals the judgment favoring De Paul Hospital School of Nursing, Inc., awarding $61,136.49 damages with interest for rate

overcharges under § 392.200, RSMo. 1969,[1] and attorney's fees of $26,000 under § 392.-350 of the statutes. For reasons we shall discuss, the judgment is affirmed.

Respondent (hereinafter Nursing School) maintains an eight-story nurses' residence adjacent to De Paul Hospital in St. Louis. The residence, operating under a hotel license, has 200 bedrooms of which approximately 53 are used by transient guests including female friends and families of student nurses and patients in the hospital. In May, 1953, appellant (hereinafter Telephone Company) installed a telephone system in the nurses' residence, consisting of a Private Branch Exchange (PBX) switchboard, 220 stations, three trunk lines, and seven tie lines to the hospital switchboard. Appellant charged the "commercial flat rate" from May, 1953 to July 28, 1968, and the "commercial measured rate" from that date through January 4, 1972.

During this period, 1953–1972, appellant charged the lower "Hotel-Motel Rate" to hotels and apartment hotels offering their guests substantially the same service as that provided the Nursing School residents, including a telephone in each room with local and long distance call privileges charged on a per call basis. Also during this period appellant charged two institutions, of similar character for these purposes, the Missouri Athletic Club (hereinafter M.A.C.) and the Evangeline Residence, the lower "Hotel-Motel Rate."

The Nursing School unwittingly paid the higher rate until January, 1968, when, being advised of its entitlement to the lower rate by Mr. Thomas Mattingly of Dial Economy Corp., the Nursing School opened negotiations to secure a rate reduction and recover past overcharges. A detailed recital of these negotiations is unnecessary, except to note they failed and on October 9, 1968, the Nursing School filed its complaint with the Public Service Commission. After

hearing, the Commission entered its order June 10, 1969, finding that the Nursing School was not entitled to the "Hotel-Motel Rate." This order, appealed to the Cole County Circuit Court, was set aside as unreasonable and unlawful because "by its findings the Commission wholly disregarded the substance of the complaint, all of the briefs and all of the evidence to the effect that the complainant in this case was being discriminated against . . . The Commission completely ignored the one question it was being asked to decide." This judgment of the trial court was affirmed on appeal. See *State ex rel. De Paul Hospital v. Public Service Commission*, 464 S.W.2d 737 (Mo.App.1970). On the subsequent rehearing before the Commission, appellant was ordered to charge respondent the lower "Hotel-Motel Rate" and in conformance with that order, the rates were reduced effective January 4, 1972.

In the present suit, filed January 12, 1972, the court awarded damages for overcharges for the period May, 1953 to January, 1972, with interest, all in the amount of $61,136.49. Appellant, while otherwise excepting to the finding, does not challenge the *accuracy* of the calculated overcharge. Similarly, the court heard detailed evidence of respondent's attorney's service and though appellant questions the propriety of the award, no challenge is made to the *amount*, i. e., $26,000.

Appellant presents two contentions for review: First, that the claim for damages accrued month by month as overcharges were paid and either the three year or the five year statute of limitations applies, barring a substantial portion of the claim; and second, that the trial court mistakenly found the acts of appellant were "willful," and thus erred in awarding attorney's fees.

"Our review of this court tried case is governed by Rule 73.01(3) V.A.M.R., which

---

1. Section 392.200 is the general section of the chapter relative to telephone and telegraph company prescribing requirements for adequate instrumentalities and facilities, adequate service, just and reasonable charges, prohibitions against unreasonable preference or unjust

discrimination and similar responsibilities relative to telephone company operation and service.

All statutory references in this opinion are RSMo. 1969, V.A.M.S., unless otherwise noted.

directs us to review the case on the law and the evidence, giving due regard to the trial court to have judged the credibility of the witnesses. *Wurtz v. Daniel Hamm Drayage Co.*, 530 S.W.2d 752 (Mo.App.1975); *Brunswick Corp. v. Briscoe*, 523 S.W.2d 115 (Mo.App.1975). And while Rule 73.01, as amended effective January 1, 1975, deleted the phrase 'the judgment shall not be set aside unless clearly erroneous' as it previously appeared in Rule 73.01(d), the appellate courts are still admonished not to be 'judicial second guessers' as to trial court findings.[2] *Morris v. Holland*, 529 S.W.2d 948 (Mo.App.1975). As stated in *Morris v. Holland, supra*, at 952: '[T]hat when the decision depends upon the credibility of the witness and the weight of the evidence, an appellate court should generally defer to the findings of the trial court's unless it is satisfied that they should have been otherwise.' " *Brand v. Brand*, 534 S.W.2d 628 (Mo.App., 1976).

When as here, the trial court has provided no findings of fact or conclusions of law, none having been requested, "all fact issues shall be deemed found in accordance with the result reached and the judgment must be affirmed, if it is correct on any reasonable theory supported by the evidence." *Gottlieb v. LaBrunerie*, 514 S.W.2d 27, 28[1] (Mo.App.1974).

Examining appellant's first contention that a substantial portion of the award is barred by the applicable statute of limitations, we note that the damages allowed were based on overcharges from May, 1953 to January, 1972, (when the overcharges ceased) plus interest to the date of judgment in the trial court. As previously stated, the parties agree that this dollar amount correctly reflects the overcharge plus interest for the period shown; however, there is sharp disagreement as to the period for which damages for such overcharges should have been allowed. Appellant asserts respondent's cause of action accrued month by month on each overcharge and that the applicable statute of limitations will bar recovery on all overcharges more than three or five years immediately prior to commencement of the proceedings before the Missouri Public Service Commission on October 9, 1968. By appellant's argument, amounts accruing prior to October 9, 1965, would be barred if the three year statute is applicable, while those accruing prior to October 9, 1963, are barred if the five year statute applies. No suggestion is made that the filing of the original complaint did not toll the statutes of limitations; accordingly, it is conceded that overcharges for the period October 9, 1968, to January 4, 1972, are due.

As we interpret appellant's argument, § 392.350 is a *penal* statute because of its provision regarding attorney's fees[3] so that the three year limitations period provided by § 516.130 or § 516.400,[4] is applicable,

2. "Even with the deletion of the 'clearly erroneous' phrase from Rule 73.01, recent appellate court decisions still cling to the interpretation that under Rule 73.01(3) the judgment of the trial court in a court tried case is not to be set aside unless clearly erroneous. *Farmers Alliance Mut. Ins. Co. v. Reed*, 530 S.W.2d 470 (Mo.App.1975); *Ehrle v. Bank Bldg. & Equip. Corp.*, 530 S.W.2d 482 (Mo.App.1975); *Keokuk Investment Co. v. Doerhoff*, 530 S.W.2d 507 (Mo.App.1975)." *Brand v. Brand, supra*.

3. Section 392.350 provides in part as follows: "In case any . . . telephone corporation shall do or cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or other thing required to be done by this chapter or by any order or decision of the commission, such telegraph cor-

poration or telephone corporation shall be liable to the person or corporation affected thereby for all loss, damage, or injury caused thereby or resulting therefrom, and in case of recovery, *if the court shall find that such an act or omission was willful, it may, in its discretion, fix a reasonable counsel or attorney's fee*, which fee shall be taxed and collected as a part of the costs in the action . . ." (Emphasis ours). The emphasized portion of the statute relative to attorney's fees is that which appellant argues makes this section a "penal statute."

4. Appellant did not plead the applicability of § 516.400 and therefore may not rely upon it. See *Knisely v. Leathe*, 256 Mo. 341, 166 S.W. 257 (1914); *Gibson v. Ransdell*, 188 S.W.2d 35 (Mo.1945); *Modine Manufacturing Co. v. Car-*

limiting damages to $10,355.40. If it is not barred by either three year statute, appellant asserts the claim is barred by the general five year statute of limitations, § 516.-110, narrowing damages to $17,456.87. For reasons set out hereafter, we need not decide which statute would apply in an appropriate case under § 392.350.

Respondent correctly argues that the statutes of limitations asserted by appellant are governed by § 516.100, RSMo 1969, which provides that "civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, *after the causes of action shall have accrued*; . . . ." (Emphasis ours). The key issue here is the time of accrual of the cause of action. We agree with respondent that no part of its claim is barred by any statute of limitations because no cause of action for overcharges and discrimination under § 392.200 could be brought until the Public Service Commission acted on the complaint of October 9, 1968, and finally determined that, of the two published rates, respondent was entitled to the hotel rate. This did not occur until the effective date of the final order, January 4, 1972. Only then did respondent's cause of action accrue and become capable of ascertainment and the last item of its damage become known, "so that all resulting damage could be recovered, and full and complete relief obtained." Section 516.100. "In general a cause or right of action accrues, so as to start the running of the statute of limitations, as soon as the right to institute and maintain a suit arises, or when there is a demand capable of present enforcement, or when there is a remedy available; and whenever one person may sue another a cause of action has accrued and the statute of limitations begins to run, but not until that time. So, whether at law or in equity, *the cause of action arises when, and only when, the aggrieved person has the right to apply to the proper tribunal for relief.* The statute does not attach to a claim for which there is no right of action, and does not run against a right for which there is no corresponding remedy or for which judgment cannot be obtained. The true test, therefore, to determine when a cause of action has accrued is to ascertain the time when *plaintiff could first have maintained his action to a successful result, regardless of the time when actual damage results*; the fact that he might previously have brought a premature or groundless action is immaterial." (Emphasis added). 54 C.J.S. Limitations of Actions § 109, pp. 11–14; see also 51 Am. Jur.2d, Limitations of Actions, § 107, pp. 679–680. This is also the Missouri rule: "A statute of limitations begins to run when a right to sue arises on an accrued cause of action." *McCandlish v. Estate of Timberlake*, 497 S.W.2d 191, 195[2] (Mo.App.1973); *Neal v. Laclede Gas Company*, 517 S.W.2d 716, 718[1] (Mo.App.1974). "A claim for relief has accrued when a right exists to institute a suit for its enjoyment." *State ex rel. Collector of Revenue of City of St. Louis v. Robertson*, 417 S.W.2d 699, 700[1] (Mo.App.1967); *Boyd v. Buchanan*, 176 Mo. App. 56, 162 S.W. 1075 (1914). Stated somewhat differently, "the time begins to run under a statute of limitations only after the right to prosecute a claim to a successful conclusion has accrued . . . It does not necessarily begin to run when the liability is created." *Beckers-Behrens-Gist Lumber Company v. Adams*, 311 S.W.2d 70, 74[4] (Mo.App.1958), holding that the statute does not begin to run where there is an unfulfilled condition precedent to the ability to sue. See also *Anderson v. Dyer*, 456 S.W.2d 808, 811[3] (Mo.App.1970); *National Credit Associates, Inc. v. Tinker*, 401 S.W.2d 954, 956[2] (Mo.App.1966). "Where a party's right depends on the happening of an event in the future, the cause of action accrues, and the statute of limitations begins to run, only at the time when the event happens . . . Whether the contingency affects the right or merely the amount of recovery, the rule is the same . . . ."

*lock*, 510 S.W.2d 462, 467[2, 3] (Mo.1974). However, the provisions of § 516.400 and § 516.130(2) are substantially similar and as we hold that neither applies in this case, we need not distinguish nor compare them.

54 C.J.S. Limitations of Actions § 110a, pp. 14–15; see also 51 Am.Jur.2d, Limitations of Actions, § 111, p. 682. Thus the plaintiff's cause of action cannot be said to have accrued until it is within his power to prosecute a suit to a successful judgment.

In *State ex rel. Kansas City Power and Light Company v. Buzard*, 350 Mo. 763, 168 S.W.2d 1044, 1047[4, 5] (en banc 1943), it was stated: "there can be no doubt that the Public Service Commission has exclusive jurisdiction to determine and classify which of two approved rates apply to a customer of a public utility . . . we find that if an electric utility has two approved rates and renders service to a consumer of electricity, charging the consumer the higher rate, and the customer contends the service rendered puts him in the classification of the lower rate, then that consumer can file a complaint before the Commission for it to determine his proper classification in reference to the service rendered him under schedule to the two rates. The power of the Commission to classify is not limited to the service to be rendered, but it has power to determine the classification of the service rendered." The court went on to hold that until the Public Service Commission has determined which of two rates should be applied to a consumer, a circuit court is *without jurisdiction* to entertain a suit for an overcharge, *supra* at 1047–8[7]. The Public Service Commission's powers over telephone rates are equally broad. See *Johnstown Telephone Company v. Berkebile*, 283 S.W. 456, 458 (Mo.App.1926).

We hold that since respondent could not have brought a viable suit until the Public Service Commission finally determined the correct rate, respondent had no accrued cause of action and no statute of limitations was triggered until that date. As respondent commenced its suit almost immediately thereafter, we need not decide which statute of limitations applied. This result furthers the consumer protective purpose apparent in the whole regulatory scheme of the Public Service Commission law. *State ex rel. Laundry, Inc. v. Public Service Commission*, 327 Mo. 93, 34 S.W.2d 37, 42–3[2, 3] (1931).

■ It is the clear intent of the public service commission law that utilities shall, without the supervision of their customers, provide adequate service at only the correct rate, and no more. This is a duty imposed by law. It was, we believe, the purpose of the legislature, not that customers be required to employ experts to verify the correctness of rates charged, but rather that they might rely on the telephone company for proper adherence to its approved rate tariffs. Further, the policies behind statutes of limitations, to encourage repose and stability,[5] would not be frustrated by permitting a consumer who has been overcharged for utility service to recover the full amount of the overcharge. The essential fact of the overcharge will have been determined by the Public Service Commission, and the number of years of the overcharge will be a matter of record for both the company and consumer.

This is not to say that in some future case, should a consumer come into possession of information clearly putting him on notice that he is being charged an improper rate but fails to act upon such information for an unconscionable period of time, an equitable defense might not be available to the telephone company. But where, as here, the consumer acts expeditiously to determine the amount of the overcharge, if any, and to obtain a rebate he will not be barred from recovering the full amount of the illegal overcharges.

5. "As numerous cases point out, statutes of limitations promote repose by giving security and stability to human affairs; they stimulate promptness and punish negligence; their object is to suppress fraudulent and stale claims from being asserted after long lapses of time when perhaps the necessary vouchers and evidence are lost, or when the facts have become obscure, or the memory of witnesses defective, or when witnesses may no longer be available either by reason of death or because their whereabouts have become unknown." *Bisesi v. Farm & Home Savings & Loan Ass'n of Missouri*, 231 Mo.App. 897, 78 S.W.2d 871, 873[2] (1935); *National Credit Associates, Inc. v. Tinker*, 401 S.W.2d 954, 956[1] (Mo.App. 1966); 53 C.J.S. Limitations of Actions § 1, pp. 902–3.

Appellant for its second point argues the trial court erred awarding attorney's fees because the evidence fails to justify a finding that the telephone company's acts in discriminating against the Nursing School were "willful" as that term is used in § 392.350. Resolution of this issue necessitates defining the term "willful." This is not an easy task. 94 C.J.S. Willful, Willfully pp. 620–637, lists a profusion of definitions and shadings of meaning for the term. Appellant argues that "willful" means not only that defendant intended the act but also intended the harmful consequences of that act. Respondent asserts that "willful" means only "intentional" or "voluntary." We perceive three general levels of intent to which the word willful may refer.

It is apparent the use of the term in criminal and civil jurisprudence are in most instances poles apart. "The meaning of the word 'willful' depends upon the context in which it appears; and particularly the kind and nature of the statute. Where the term is used in connection with the statute defining criminal conduct, the word 'willful' usually requires something more than deliberate and intentional as opposed to accidental and includes an intent of a wrongful or evil purpose . . . But where the statute relates to a civil rather than a criminal penalty the meaning of the word connotes only voluntary and intentional action as contrasted with accidental . . . the word 'willful' [does] not require proof of an evil intent but that it is sufficient if the failure to act was either intentional or plainly indifferent to the requirements of the statute." *Stanton v. Machiz*, 183 F.Supp. 719, 725[3] (D.C.Maryland 1960); see also *United States v. Illinois Central Railroad Co.*, 303 U.S. 239, 242–3, 58 S.Ct. 533, 82 L.Ed. 773 (1938). Between these poles, but more closely related to the criminal standard, lies the level of intent necessary to justify punitive damages. "The acts of a defendant which justify the imposition of punitive damages are those which are willful, wanton, malicious or so reckless as to be in utter disregard of the consequences. Such acts are clearly distinguished from negligence. While they need

not always include an intent to do harm, they must show such a conscious disregard for another's rights 'as to amount to willful and intentional wrongdoing.' " *Warner v. Southwestern Bell Telephone Company*, 428 S.W.2d 596, 603[15] (Mo.1968).

In construing "willful" as used in § 392.350, we bear in mind the long standing doctrine that the statute is to be liberally construed for the public's, ergo the consumer's, protection. "[T]he Public Service Commission Law of our own state has been uniformly held and recognized by this court to be a remedial statute, which is bottomed on, and is referable to, the police power of the state, and under well-settled legal principles, as well as by reason of the precise language of the Public Service Commission Act itself, is to be 'liberally construed with a view to the public welfare, efficient facilities and substantial justice between patrons and public utilities.' " *State ex rel. Laundry, Inc. v. Public Service Commission*, 327 Mo. 93, 34 S.W.2d 37, 42–3[2, 3] (Mo.1931). "In its broadest aspects, the general purpose of such regulatory legislation is to substitute regulated monopoly for destructive competition. But the dominant thought and purpose of the policy is the protection of the public while the protection given the utility is merely incidental. *State ex rel. Electric Company of Missouri v. Atkinson, et al.*, 275 Mo. 325, 204 S.W. 897; State ex rel. *Pitcairn v. Public Service Commission*, 232 Mo.App. 535, 111 S.W.2d 222." State ex rel. *Crown Coach Company v. Public Service Commission*, 238 Mo.App. 287, 179 S.W.2d 123, 126[5, 6] (1944).

Section 392.350 has two parts: The first, as noted, is a remedial provision allowing persons affected by any act or omission in violation of the law or order of the Public Service Commission to recover from the offending company all losses resulting therefrom; the second allows the court in its discretion to award attorney's fees as costs if such acts or omissions are found to be "willful."

"Willful" as used in this section is not the level of intent needed for criminal liability

or punitive damages in tort cases. The statute does not say "willful and wanton," or "willful and malicious" as would be the case if the legislature intended to apply that high standard. Neither is it the "willful" of civil statutes which usually denotes that defendant merely intended to do the act. If that were its intended meaning, all overcharges would be willful, and the statute clearly requires that the court make an additional finding in order to justify the imposition of attorney's fees as costs.

■ We hold that in the context of rate discrimination, "willful" means either intentionally charging an incorrect rate knowing it was incorrect, or charging a rate when the utility has no reasonable basis for placing the individual consumer within the classification calling for that rate. This construction is consistent with the regulatory scheme of the law which places the burden of charging the correct rate and the correct rate only, upon the utility. Proceedings before the Public Service Commission and the courts to correct and recover for overcharges are, as this case amply demonstrates, prone to be lengthy and expensive. In most cases the consumer is greatly overmatched by the expertise, legal staff and resources of the utility. This unevenness is somewhat balanced by § 392.-350. If the utility elects to defend a challenged rate to the full extent allowed, and the defense it asserts is without reasonable basis in law, the consumer may in proper case recover the attorney's fees as costs.

To determine whether appellant's discrimination was "willful" it is necessary to compare the services which the Nursing School provided its residents with that of other facilities enjoying the "Hotel-Motel Rate." The Nursing School has 200 rooms. One Hundred fifty are occupied by student nurses. The other 50 are rented on a daily or monthly basis to friends and relatives of the hospital staff, patients and to those having business with the hospital. The modest fee for transients is designed to recover the costs of offering the rooms. There are phones without dials in each room available for local or long distance service. All calls are placed by the switchboard and recorded. The company charges the school for the entire cost and respondent charges guests on a per call basis for the actual use of the phone.

Appellant admitted that the physical equipment and services provided guests was the same as in the Baltimore Hotel, the DeSoto Hotel, the Fairgrounds Hotel, the M.A.C. and the Evangeline Residence. Respondent's expert, Thomas Mattingly, admitted there are many businesses in the St. Louis area having the same type of equipment but which are properly classified as commercial and charged the same rate charged plaintiff. Appellant offered into evidence portions of the transcript of the hearing before the Public Service Commission in which Mr. Mattingly stated that although a business may have the same equipment, it can be properly charged the commercial rate because the phones are used by its employees for business purposes, whereas the phones in a hotel are used by the guests for their own reasons and are supplied by the management as a service for the convenience of the guests.

Mr. Thomas Mattingly, who represented respondent in its initial negotiations with appellant, is president of Dial Economy Corp., and an officer of Telephone Cost Reduction, Inc. On December 20, 1967, Mr. C. J. Swanger, an officer of Telephone Cost Reduction, Inc., wrote Mr. R. E. Goodson, appellant's president, alleging that the Beulah Residence, a home for girls in East St. Louis run by the Salvation Army, should be entitled to the hotel rate for its phone service. Appellant sent a letter on January 10, 1968, stating that the Beulah Residence did not qualify and set forth the standards for hotel rates as follows:

"Hotel-Motel service can be provided if the following standards are met:

1. The business must have a hotel or motel license where applicable.

2. Customer must provide the following service:

*Room telephones* must be provided for the guests.

b. Long distance must be allowed by the guests over the room telephones.

3. Administrative stations cannot be connected to the same trunks used by guests."

On February 22, 1968, Mr. Swanger received a letter from appellant's District Manager amplifying the previous communication. The letter states:

"There are two basic determinants in deciding whether Hotel Private Branch Exchange Service would be appropriate for any customer of ours. First, the customer must provide room telephones for the use of his guests. Second, he must allow his guests to place both local and long distance calls from those room telephones.

Usually, there is no problem in deciding whether a customer of ours is, in fact, operating a hotel, motel or apartment hotel. If there were any doubt, certainly we would ask the customer to produce evidence that he is in this type of business. That evidence might be, for example, a hotel license.

The primary factors, of course, concern the provision of complete telephone service for guests as mentioned above. After all, the Hotel Private Branch Exchange Service offering is made because we recognize that the telephone service being provided is for the convenience of the public and not necessarily for the convenience of our customer—the hotel operator.

In this connection, we make arrangements with Hotel Private Branch Exchange Service subscribers which allow them to charge their guests a fee for handling their telephone calls. This is consistent with the concept of the service being for the convenience of the public. It helps our customer offset the expense of providing the service to the public—his guests."

The letter than stated that the Beulah Residence did not qualify for hotel rates as there are no telephones in the rooms and the guests are not allowed to place long distance calls.

Mr. Swanger then sent appellant a letter dated February 27, 1969, enclosing copies of the letter he wrote to appellant and Mr. Hayes' answer stating that by the criterion set out in appellant's answer respondent was entitled to hotel rates. The letter went on to note that the request had been denied on the basis that: (a) the guests are not transients, and (b) respondent was not a residence but a school. It was pointed out that the hospital is the school, the residence is only a residence, and that "(a)" is not only a *new* criteria not listed before, but is incorrect as the residence has frequent transient guests.

On March 22, 1968, Mr. Hayes, appellant's District Manager, sent Mr. Swanger a letter setting forth the reasons respondent did not qualify for hotel rates. This letter incorporated the criteria set forth in Mr. Hayes' previous letter regarding the Beulah Residence and stated: "The items outlined in that letter are the controlling factors regarding the De Paul Nurses' Residence." However, appellant went on to suggest a new criterion, that the "primary business endeavor" of the customer must be the operation of a hotel. Appellant distinguishes between respondent, alleging it operates the residence as a convenience to students and staff, and the M.A.C., which it says is the same as any other hotel except that it is "a private operation." It also states that respondent's having a hotel license does not change things. While the Evangeline Residence does not have a hotel license, appellant asserts: "Other evidence though tells us that Evangeline Residence has as its primary function the operation of a hotel."

After a personal meeting Mr. Swanger wrote appellant on March 25, 1968, pointing out that the nurses' residence is a separate entity from the hospital. In that meeting appellant apparently asserted that the residence was not separate as it was sustained by the hospital. In his letter Mr. Swanger pointed out that Queeny Tower, a part of the Barnes Hospital Group, is now enjoying hotel rates and is sustained by Barnes Hos-

pital. Queeny Tower could not qualify for the hotel rate under the criterion appellant wanted to apply to respondent yet was receiving that service.

On April 11, 1968, appellant sent Mr. Swanger a letter which stated in part:

"There are many criteria for determining whether a subscriber qualifies for Hotel Private Branch Exchange Service, some of which have been pointed out to you on prior occasions. In every case we are interested in determining if the primary business endeavor of the subscriber is that of a hotel and if in carrying out that endeavor the usual hotel services are provided.

From our review of the information you have given us, we have determined that the primary business endeavor of the De Paul Hospital Nurses Residence is not that of a hotel.

There is an employee-employer relationship here, which to my mind cancels the possibility of calling this residence a hotel. The staff members who stay there from time to time are receiving compensation from the hospital for duties they perform. The students who stay there are receiving compensation from the hospital for duties they perform. I realize that the students may be paying tuition and fees; however, the housing arrangements surely represent compensation of kind for the duties these people perform as members of the hospital staff.

Further, it appears that this residence is provided by the hospital not only for the convenience of the hospital staff and students but also for the convenience of the hospital administration. The arrangement allows the hospital administration to house its staff close by and allows them to be assured that they have a safe and responsible living arrangement for members of its official family.

The fact that De Paul might provide rooms to the public from time to time at the residence does not change the case, as it does not alter the primary business endeavor of the residence."

On July 10, 1968, Mr. Mattingly sent appellant a legal opinion prepared by respondent's attorney refuting point by point each of the criteria alleged to disqualify respondent for the hotel rates. Respondent's complaint was filed with the Public Service Commission on October 9, 1968.

As there is no evidence that appellant intentionally placed the Nursing School in a wrong rate classification, the holding of the trial court can be sustained, only if there was no reasonable basis for the classification. We distinguish two situations: The first and most common is illustrated by *State ex rel. Laundry, Inc. v. Public Service Commission,* 327 Mo. 93, 34 S.W.2d 37 (1931). There the St. Louis County Water Company established a lower rate for "manufacturers." Plaintiffs, owners of laundries, were charged the standard meter rate. Plaintiffs used sufficient quantity of water to otherwise qualify for the rate but were denied it on the theory that they were not "manufacturers." The Supreme Court affirmed the judgment of the circuit court overturning the decision of the Public Service Commission that plaintiffs were not entitled to the lower rate. It was held to be unlawful discrimination to charge a lower rate to one class of users who consumed the same volume of water under substantially similar circumstances.

The second situation is typified by the case at bar. Here the utility established a rate for "hotels" lower than the commercial rate because the type of service offered differs significantly from ordinary commercial uses. The court could find from the evidence the utility extended this rate to all businesses clearly operating as hotels or apartment hotels. Thus far the situation is substantially the same as in the *Laundry* case; if there were no more, plaintiff would bear a heavy burden to show willfulness. The utility could, in good faith, assert a certain type of business does not belong within the rate classification. The plaintiff would have to show that there was no reasonable basis for excluding it from the classification before the utility

could be held to have willfully discriminated against it. When a utility attempts to make reasonable classifications of its consumers, it should not be penalized for drawing firm lines. However, the appellant in the case at bar did something additional; the lower rates were not only extended to all hotels, but also to the M.A.C. and the Evangeline Residence. Neither is a hotel in the ordinary sense of the word; neither has as its primary business the letting of rooms for use by transients. Both the Nursing School and the M.A.C. have hotel licenses; the Evangeline Residence did not. The M.A.C. limits its clientele to members and their guests, the Nursing School to students and their female relatives or relatives and friends of patients of the Hospital. The Nursing School has rooms occupied for the full school year and rooms for transients. The evidence does not reveal the duration of stay of the M.A.C. guests but the Evangeline Residence required a minimum stay of 30 days.

Based on these facts the trial court could have found that appellant did not draw a firm, if misplaced, line between consumers but selectively and arbitrarily allowed the M.A.C. and the Evangeline Residence to enjoy the lower hotel rate denied the Nursing School. In this situation, where the utility has been inconsistent and arbitrary in applying its own rate tariffs we are not hesitant to find that the discrimination was willful.

From all the evidence the trial court could have found that appellant willfully refused to rectify an erroneous billing dating back to 1953. That it shifted position and asserted new criteria for the hotel rate each time respondent pointed out that it satisfied the requirements then established. That it denied respondent the correct rate without investigation apparently based on speculation and surmise as to plaintiff's internal organization and operation while extending the favored rate to others not meeting the criteria applied to respondent. On this basis the court could have found that the appellant had no reasonable basis for believing that respondent did not qualify for the hotel rate while the M.A.C., the Evangeline Residence, and the Queeny Tower did. Forcing respondent to pursue its claim through the Public Service Commission and the courts to rectify this situation, constituted a willful violation of its duty to charge only the correct rate.

■ In light of the evidence we cannot say that the trial court erred in finding the appellant guilty of willful discrimination and allocating fair attorney's fees as costs.

■ Appellant argues that because the Public Service Commission found for appellant in the original hearing, this should be conclusive to establish that there was no willful violation. While the Public Service Commission finding is a factor, the findings of the circuit court and the Kansas City Court of Appeals that the Commission's decision was not supported by competent and substantial evidence must also be considered. See *State ex rel. De Paul Hospital School of Nursing v. Public Service Commission,* 464 S.W.2d 737, 740[5] (Mo.App. 1970). In this situation, the administrative decision need not be taken by the court as conclusive proof that the defense had merit at law. The trial court is tasked by the statute with determining willfulness and is entitled to make an independent decision taking into account all the evidence before it.

The judgment is affirmed.

WEIER, P. J., and DOWD, J., concur.