Eldon HATTERVIG, Appellant,

v.

Gaston DE LA TORRE,

and

Missouri Department of Natural Resources, Respondents.

No. WD 47702.

Missouri Court of Appeals, Western District.

Dec. 28, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 1994.

Application to Transfer Denied March 22, 1994.

James W. Gallaher, David J. Moen, Jefferson City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Deborah Neff, Asst. Atty. Gen., Jefferson City, for respondents.

Before TURNAGE, C.J., and ULRICH and ELLIS, JJ.

ELLIS, Judge.

Eldon Hattervig appeals an order of the Circuit Court of Cole County affirming the decision of the Missouri Personnel Advisory Board (hereinafter "Board") approving Gaston de la Torre's action in dismissing Hattervig as Director of the Weatherization Program administered by the Division of Energy of the Missouri Department of Natural Resources (hereinafter "Department"). We affirm.

On February 15, 1991, Gaston de la Torre, the Department's Personnel Officer and appointing authority, received a formal com-

plaint against Hattervig from Rhonda Binkley, one of Hattervig's female subordinates. After conducting an investigation, on March 6, 1991, de la Torre sent Hattervig a letter dismissing him from his job as a Program Director with the Department effective March 15, 1991. Hattervig appealed his dismissal to the Board. A hearing was conducted by Hearings Officer Gene Spitzmiller on July 15 and August 27, 1991. On October 22, 1991, the Board issued a decision and order sustaining Hattervig's discharge. He then appealed to the circuit court, which on March 23, 1993, upheld the Board's decision. This appeal followed.

■ We review the Board's decision, not the judgment of the circuit court. *Franklin v. Board of Directors,* 772 S.W.2d 873, 877 (Mo.App.1989). We must defer to its findings of fact, and are not permitted to substitute our judgment for that of the Board, whose decision will be upheld unless it exceeds its authority; is not based upon substantial and competent evidence on the record as a whole; is unreasonable, arbitrary or capricious; involves an abuse of discretion; or is otherwise unlawful. *Prenger v. Moody,* 845 S.W.2d 68, 73–74 (Mo.App.1992); § 536.-140.[1]

In his first point, Hattervig argues the Board erred in affirming his dismissal because it did so on a ground not set forth in de la Torre's letter of dismissal. As a regular merit system employee, Hattervig was entitled to advance notice of his dismissal under § 36.380, which provides in part: "No dismissal of a regular employee shall take effect unless, prior to the effective date thereof, the appointing authority gives to such employee a written statement setting forth in substance the reason therefor and files a copy of such statement with the director." In the March 6, 1991, letter of dismissal, one of the reasons de la Torre gave Hattervig for his discharge was his "willful abusive behavior toward Ms. Binkley while on and off duty

[contributing] to a threatening and disruptive working environment for her, [which] under 1 CSR 20–3.070(M) [sic] constitutes grounds for dismissal." In paragraph ten of its findings of fact, the Board found that Hattervig "wilfully disrupted the working activities of [Binkley] and other employees."

■ Hattervig argues the Board's decision must be reversed because its finding concerning his disruption of the work environment *of employees other than Binkley* exceeds the scope of the notice.[2] In support of this contention, Hattervig cites two cases: *Brixey v. Personnel Advisory Bd.,* 607 S.W.2d 825 (Mo.App.1980), and *McCall v. Goldbaum,* 863 S.W.2d 640 (Mo.App.1993). In *Brixey,* the court reversed a decision of the Board upholding Brixey's dismissal where the notice of dismissal was vague and did not set forth all of the grounds for dismissal listed by the Board in its findings. *Brixey,* 607 S.W.2d at 828. In *McCall,* another case in which a decision of the Board upholding an employee's dismissal was reversed due to inadequate notice, the letter of dismissal accused McCall of three work-related infractions, only one of which, sexual abuse of clients, was punishable by dismissal for a first offense. *McCall,* 863 S.W.2d at 640. The Board upheld McCall's dismissal, but not because it found he had sexually abused clients. Instead, it found him guilty of "abusive or improper treatment," an entirely different infraction of which he had not been accused in the letter of dismissal. *Id.* at 642, 643. The court held that McCall had thus "received inadequate notice of the reason given by the Personnel Advisory Board for his dismissal." *Id.* at 643. Neither case is applicable to the facts in this appeal.

■ In this case, the notice of Hattervig's dismissal alleged and the Board made a specific finding that Hattervig willfully disrupted the working activities of his subordinate *Rhonda Binkley,* which, *standing alone,* constitutes cause to dismiss him under 1 CSR

---

1. All statutory references are to RSMo 1986 unless indicated otherwise.

2. The Board made findings that de la Torre's letter to Hattervig gave him "an opportunity prior to the dismissal to show reasons why such dismissal should not be effected" and thereby satisfied "[a]ll procedural due process requirements." However, because the adequacy of notice under § 36.380 is a question of law, we are not bound by those findings on appeal. *McClellon v. Gage,* 770 S.W.2d 466, 468 (Mo.App.1989).

20–3.070(2)(M).[3] Thus as to that allegation, there is no question Hattervig received proper notice.[4] In contrast, the court in *Brixey* did not have before it such an independent ground for Brixey's dismissal. In fact, the court explicitly acknowledged that there was "no way for [it] to determine if the [B]oard would have upheld the dismissal if [the] grounds [not specified in the notice of dismissal] had not been considered." *Brixey*, 607 S.W.2d at 828. In addition, the Board upheld Hattervig's dismissal for the *same infraction* alleged in de la Torre's letter. Thus unlike McCall, Hattervig was apprised of and had a meaningful opportunity to prepare a defense to the charge of which he was found guilty by the Board and which is the subject of our review in this appeal: that he "wilfully exhibited behavior which was disruptive to the working activities" of Rhonda Binkley. Finally, this is not a situation like that in *In re Voorhees*, 739 S.W.2d 178 (Mo. banc 1987), also cited by Hattervig, a disciplinary action involving findings of fact and conclusions of law which did not explicitly relate to *any* factual matter alleged in the notice of discipline and in which the only basis for discipline asserted by the reviewing authority was not supported by the record. Under the circumstances, we hold that de la Torre's letter adequately "set[ ] forth *in substance* the reason" for Hattervig's termination as required by § 36.380. Point denied.

In his next point, Hattervig argues there was no competent and substantial evidence to support the Board's finding that his acts were "willful" as that term is used in 1 CSR 20–3.070(2)(M). The Department claims it is enough that Hattervig intended to act, and the action taken resulted in the disruption of Binkley's working activities. In support of its position, the Department cites *De Paul Hosp. School of Nursing, Inc. v. Southwestern Bell Tel. Co.*, 539 S.W.2d 542 (Mo.App. 1976), and *Board of Educ., Mt. Vernon Schools v. Shank*, 542 S.W.2d 779 (Mo. banc 1976). In *De Paul*, the court observed that as used in civil statutes, the word "willful" generally denotes a mere intention to do an act and does not require proof that the actor was motivated by an evil intent. *De Paul*, 539 S.W.2d at 548–49. In *Shank*, our Supreme Court considered the meaning of the word "willful" as used in § 168.114.1(4), which allows a teacher to be terminated for a "willful ... violation of, or failure to obey" published school board regulations. It used the definition of "willful" set forth in Webster's Third New International Dictionary: "'done deliberately; not accidental or without purpose; intentional.'" *Shank*, 542 S.W.2d at 782.

On the other hand, Hattervig contends that in order to have violated 1 CSR 20–3.070(2)(M) he must have acted *with the specific intention* of disrupting Binkley's working activities. He cites Black's Law Dictionary and *Warner v. Southwestern Bell Tel. Co.*, 428 S.W.2d 596 (Mo.1968).[5] Black's quotes a Pennsylvania case holding that as used in worker's compensation laws, "willful misconduct" of an employee "means more than mere negligence, and contemplates the intentional doing of something with knowledge that it is likely to result in serious [consequences], or with reckless disregard of

---

**3.** According to this regulation, which was expressly relied on by both de la Torre and the Board, any employee in the classified service who has "been abusive or physically violent toward other employees while on duty or in the duty area or has willfully exhibited behavior which is disruptive of the working activities of other employees" is subject to suspension, demotion, or dismissal for cause, depending on the seriousness of the case.

**4.** In *Giessow v. Litz*, 558 S.W.2d 742 (Mo.App. 1977), in sustaining Giessow's dismissal, the Civil Service Commission of St. Louis County made findings of fact regarding allegations which were not included in his formal notice of dismissal. Observing that the "reviewing court need not sustain the Commission on each and every one of [its] subsidiary findings of fact," the court held that reversal was not required because the Commission's decision was "amply supported" by findings on the allegations about which Giessow had been properly notified. 558 S.W.2d at 750.

**5.** Hattervig erroneously cites *Voorhees*, 739 S.W.2d at 186, for the general proposition that whether an act is "willful" depends on the actor's purpose and intent. What the Court actually said in the passage quoted by Hattervig was that whether Voorhees' judicial order was properly characterized as an administrative act (which he had authority to perform) or an act of discipline (which he did not) depended on his purpose and intent.

its probable consequences." *Black's Law Dictionary* 1774 (4th ed. 1968). In *Warner*, the Court held that punitive damages cannot be imposed unless the defendant's acts "show such a conscious disregard for another's rights 'as to amount to willful and intentional wrongdoing.'" *Warner*, 428 S.W.2d at 603 (citations omitted).

■ The first of these interpretations merely involves one intention, namely, to act in the absence of reflex, accident, or coercion, while the second involves two intentions, namely, one to act and one to disrupt working activities. We need not decide which of these alternatives is correct because under *either* interpretation, there is competent and substantial evidence to support the Board's finding that Hattervig "wilfully exhibited behavior which [disrupted] the working activities" of Rhonda Binkley.

■ We must consider the evidence and all reasonable inferences therefrom in a light most favorable to the Board's decision. *See Shell Oil Co. v. Director of Revenue*, 732 S.W.2d 178, 180 (Mo. banc 1987), *appeal dismissed*, 485 U.S. 983, 108 S.Ct. 1283, 99 L.Ed.2d 494 (1988). So considered, and as firmly grounded in the ten factual findings made by the Board in this case, the evidence shows that for approximately three years, Hattervig harbored an unrequited romantic interest in Binkley. He frequently called her into his office to consult with her and seek her advice on personnel matters and other supervisory decisions. During several of these meetings, he also offered to discuss his personal problems with her. Binkley repeatedly expressed her discomfort is discussing these matters and advised Hattervig that she did not want to participate in any closed-door meetings of a personal nature. She also asked him to treat her as he treated the other office employees and to let her do her work without interruption. Despite these appeals, Hattervig continued to call her into his office several times a day. When she made out-of-town business trips, he often adjusted his own work and travel schedule so he could either travel along with her or show up in the same location at the same time. While on these trips, Hattervig frequently invited Binkley to socialize with him after working hours. She regularly declined these invitations for dinner, drinks, and dancing, and when she returned to Jefferson City after a trip, he sometimes asked her what was wrong and why she was avoiding him or didn't want to socialize with him. On September 5, 1990, Hattervig called Binkley into his office. When she arrived, he closed the door and hugged her. When she said she had to leave, he hugged her a second time. She then pushed him away and left his office. On September 7, 1990, they had another meeting in Hattervig's office, during which Binkley told Hattervig that she had no personal feelings for him and that she wanted to spend her time in the office working.

Shortly thereafter Binkley announced her engagement to a fellow office employee also supervised by Hattervig. Shortly after this announcement and the hugging incident, he became critical of Binkley and her work, both to her and her co-workers. The favorable supervisory attitude he previously had regarding her and the professional praise he frequently gave her were also both abruptly withdrawn when she made it clear that she was not romantically interested in him. Around November, 1990, he directed her to cease talking with all but two or three Weatherization Program employees, including her fiance, ostensibly to allow her to concentrate on her duties. Hattervig's own work-related interactions with Binkley also rapidly declined to the point where it undermined her ability to do her job. While Hattervig used to meet with Binkley three or four times a day, after her rejection of his advances and her engagement, he met with her only once a month or so and communicated with her primarily by written memoranda, even though he was frequently seen walking by her office to observe her activities. Certainly the Board reasonably could have concluded from this evidence that Hattervig intended to perform these acts and that they were not accidental or the product of reflex or coercion. The evidence is also competent and substantial proof that Hattervig *intended* to disrupt Binkley's working activities, at least after September 5, 1990. We rule this point against Hattervig.

■ Hattervig claims in his next point that the Board relied upon incompetent hearsay evidence in making its finding that Hattervig willfully disrupted the working activities of Binkley. We have examined the evidence in question, which was admitted over Hattervig's objection and consists of paragraphs six, seven and eight of the affidavits of Ruth Sade and Larry Malaney. Assuming, without deciding, that in making its decision the Board erroneously considered those paragraphs as substantive evidence of Hattervig's willful disruption of Binkley's work environment, we hold that any such error was harmless because "reception of hearsay evidence does not dictate a reversal of the agency decision unless there is not sufficient competent evidence to sustain the decision." *Franklin,* 772 S.W.2d at 883. As discussed earlier, in reviewing the whole record we find it contains ample competent, non-hearsay evidence to support the Board's finding. *Id.* at 885. Point denied.

■ In his final point, Hattervig argues the Board erred in upholding his dismissal because the Department failed to follow its own progressive discipline policy in his case. The section on "Progressive Discipline" in the Department's Administrative Policy and Procedures Manual states:

> The Department of Natural Resources ... views discipline as a way to promote responsible, orderly, and efficient personal conduct on the job and to contribute to the accomplishment of the goals of public service.... In applying discipline, a progression of disciplinary measures from least to most severe should be instituted.

The measures listed are informal counseling (Step 1), formal written reprimand (Step 2), suspension without pay (Step 3), and dismissal (Step 4). Hattervig contends his dismissal was improper because the Department did not use any of the less severe forms of discipline prior to dismissing him. The Department responds that before his dismissal Hattervig did in fact receive informal counseling in accordance with the progressive discipline policy. Step 1 provides:

> Privately and confidentially, the supervisor should discuss with the employee the specific shortcomings of the employee's behavior or rule infractions. The supervisor should avoid dealing in generalities, strive to obtain all the necessary facts to arrive at a satisfactory solution, give the employee an opportunity to express his or her side, and, allow the employee to participate in developing a solution.

The Board made a factual finding that in March, 1989, de la Torre, acting on the basis of similar complaints submitted by three of Hattervig's other female subordinates (not Binkley), counseled Hattervig "to avoid offering unwanted personal attention to [his] female subordinates." Hattervig argues that this counseling did not comply with Step 1 since he was not given the names of the employees making the complaints and was not asked about or given a chance to tell his side of the story. We disagree. Although the three employees involved were not identified during their discussion, de la Torre testified that he explained the nature of the charges to Hattervig "[a]s specific[ally] as we could get under the circumstances." De la Torre also gave Hattervig a chance to present his side of the story, as difficult as that may have been without knowing exactly who was making the complaints. In addition, he "warned [Hattervig] at that time that such conduct would not be tolerated [in the future]." Finally, Binkley testified that during their September 7, 1990 meeting, Hattervig told her "he knew that Mary and Jeannie were the ones who had complained about sexual harassment earlier" and that "he had been trying to deal with me in different ways." We hold that the Department substantially complied with the requirements of Step 1 when de la Torre informally counseled Hattervig in March, 1989.

The Board also made a finding that a few days after the September, 1990, hugging incident, Binkley met with de la Torre. Although she didn't specifically mention the incident during their conversation, she told him that Hattervig was continuing to show her unwanted personal attention similar to that which she had reported earlier. De la Torre immediately counseled Hattervig about showing Binkley unwanted personal attention, and Hattervig agreed to get some professional help about his behavior. This en-

tirely separate informal counseling session also substantially complied with Step 1.

■ The Department's progressive discipline policy also provides: "However, it must be recognized that flexibility must be built into the application of discipline. Depending on the severity of infractions, management reserves the right to apply a written reprimand or even suspension as an initial disciplinary step." In fact, in extreme cases the policy permits "immediate dismissal ... without prior use of less severe forms of discipline." Accordingly, although the language of the policy establishes progression as the norm, if the circumstances warrant, the appointing authority may skip one or more disciplinary steps. Here, it is conceded that Steps 2 and 3 were not utilized and we must determine whether the Department properly jumped from Step 1 to Step 4 in disciplining Hattervig. According to Step 4: "Dismissal should be considered a last resort and invoked only when it is determined that no reasonable possibility exists to resolve the problem through alternate approaches." The record supports the Department's argument that in making a determination that dismissal was required in this case, de la Torre considered the following factors: the striking similarity of the March, 1989, allegations against Hattervig; the counseling Hattervig received after both the March, 1989, and September, 1990, incidents; the fact that Hattervig had already attended "sensitivity training" designed to prevent professionally and legally inappropriate workplace behavior; and the possibility of Title VII liability for failure to take appropriate action against an employee known to be sexually harassing a subordinate employee. Taking all these factors into account, de la Torre concluded: "We thought about the rights of our other employees who had complained and decided that any lesser form of discipline would not alleviate the situation since Mr. Hattervig had already been counseled about it and it would not have made Ms. Binkley's work environment any easier to cope with." We therefore hold that the Board properly could have found that the progressive discipline policy was substantially complied with in this case. Hattervig's final point is denied.

The judgment is affirmed.

All concur.