**Charles E. OVERMAN and Bennett Massey d/b/a AAA Plumbing Co., Respondents,**

**v.**

**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant.**

**No. WD 36583.**

Missouri Court of Appeals, Western District.

Jan. 21, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 4, 1986.

Application to Transfer Denied April 15, 1986.

James E. Taylor, Leo E. Eickhoff, Jr., Ann Mesle, Gary L. Lane, Kansas City, for

appellant; Edgar Mayfield and William C. Sullivan, St. Louis, of counsel.

Jeremiah D. Finnegan, Thomas B. Sullivan, III, William Randall Williams, Kansas City, for respondents.

Before DIXON, P.J., and SOMERVILLE and NUGENT, JJ.

SOMERVILLE, Judge.

Charles E. Overman and Bennett Massey, d/b/a AAA Plumbing Co. (hereinafter Overman and Massey), pursuant to § 392.-350, RSMo 1978,[1] filed suit against Southwestern Bell Telephone Company (hereinafter Bell) for compensatory damages (Count I), punitive damages (Count II), and attorney's fees (Count III). All three counts were posited on Bell's exclusion of "AAA Plumbing Co." from its Greater Kansas City "Yellow" and "White" pages directories, and directory assistance, during the years 1974, 1975, 1976 and 1977.

A lengthy jury trial ensued. Bell's motion for a directed verdict on all counts at the close of all the evidence was overruled. Counts I and II were submitted to the jury which returned a verdict in favor of Overman and Massey and against Bell and awarded them One Thousand Eight Hundred Fifty-Five Dollars ($1,855.00) as compensatory damages (Count I) and Ten Million Dollars ($10,000,000.00) as punitive damages (Count II). Judgment was rendered in favor of Overman and Massey and against Bell on Counts I and II in accordance with the verdict. Bell filed a timely motion for judgment notwithstanding the verdict on all three counts on grounds of insufficiency of the evidence to support the same, or, in the alternative, for a new trial.

Before said post-trial motions were ruled, the trial court conducted a hearing on Count III (attorney's fees) and awarded Overman and Massey One Hundred Thirty-Nine Thousand Two Hundred Ninety-Nine Dollars and Fifty-Eight Cents ($139,299.58) as attorney's fees, same to be taxed against Bell as part of the costs. Thereafter, Bell's motion for judgment notwithstanding the verdict was overruled and its motion for new trial was conditionally denied (notwithstanding the trial court's finding that Bell was entitled to a new trial on the ground that the verdict for punitive damages was "excessive") if Overman and Massey filed "a written remittitur of Five Million Dollars ($5,000,000.00) from the verdict for punitive damages" before a specified date. Overman and Massey filed a written remittitur of Five Million Dollars ($5,000,000.00) before the specified date regarding the judgment of Ten Million Dollars ($10,000,000.00) for punitive damages under Count II, and also filed a *voluntary* remittitur of $230.00 regarding the judgment of One Thousand Eight Hundred Fifty-Five Dollars ($1,855.00) for compensatory damages under Count I. Bell has appealed.

The points of error relied on by Bell on appeal, twenty-three in number, run the gamut of the trial. Overman and Massey, in addition to responding to each of the twenty-three points relied on by Bell, seek reinstatement of the jury verdict in their favor for Ten Million Dollars ($10,000,000.00) as punitive damages under Rule 78.10 [2] and *Firestone v. Crown Center Re-*

---

1. "Liability for loss or damage.—In case any telegraph corporation or telephone corporation shall do or cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or other thing required to be done by this chapter or by any order or decision of the commission, such telegraph corporation or telephone corporation shall be liable to the person or corporation affected thereby for all loss, damage or injury caused thereby or resulting therefrom, and in case of recovery, if the court shall find that such an act or omission was willful, it may, in its discretion, fix a rea-

sonable counsel or attorney's fee, which fee shall be taxed and collected as a part of the costs in the action. An action to recover for such loss, damage or injury may be brought in any court of competent jurisdiction by any such person or corporation."

2. "Consenting to a remittitur as a condition to the denial of a new trial does not preclude the consenting party from asserting on appeal that the amount of the verdict was proper or that the amount of the remittitur is excessive. A party consenting to a remittitur may not initiate the

*development Corp.*, 693 S.W.2d 99 (Mo. banc 1985).

Bell's first point on appeal looms above all the rest in order of scope and importance—sufficiency of the evidence to warrant submission of punitive damages. At this juncture the remaining points may be generally characterized as posing issues as to the admissibility of certain evidence, the exclusion of certain evidence, excessiveness of the verdict for punitive damages due to bias and prejudice on the part of the jury, instructional error, permitting one of Overman and Massey's attorneys who actively participated in the trial to testify as a witness on their behalf, improper closing argument, juror misconduct, and insufficiency of the evidence to support the award of attorney's fees.

Before definitively addressing the far-ranging points relied on by Bell on appeal, particularly the first point, reference to an earlier appeal involving this litigation is both relevant and instructive. This case previously reached this court on an appeal by Overman and Massey from a summary judgment rendered by the trial court in favor of Bell and against Overman and Massey on Count II (punitive damages) of their petition which was designated by the trial court as a final judgment for purposes of appeal. The prior appeal is reported in *Overman v. Southwestern Bell Telephone Co.*, 675 S.W.2d 419 (Mo.App.1984), which, for sake of clarity, is hereinafter referred to as *Overman I*. The dispositive issue in *Overman I* was whether punitive damages were within the purview of § 392.350, supra. Another division of this court held in *Overman I* that punitive damages were included in § 392.350, supra, and the summary judgment rendered in favor of Bell on Count II (punitive damages) of Overman and Massey's petition was reversed and the case was remanded for trial. In reaching its decision in *Overman I*, the court drew heavily upon *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, 539 S.W.2d 542 (Mo.App.1976), as evidenced by the following statement.

"Although the *De Paul* case did not involve a claim for punitive damages, the court considered the elements of that claim as measured by what was definitively meant by the provision for attorney's fees for *willful* acts under § 392.350." *Overman I*, supra, 675 S.W.2d at 422. In *De Paul*, and approved in *Overman I*, "willful" within the context of § 392.350, supra, was construed to mean either doing something "intentionally" knowing it was "incorrect", or doing something without a "reasonable basis" for doing so. *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 549; and *Overman I*, supra, 675 S.W.2d at 423. Pragmatically, as held in *De Paul*, and reiterated with approval in *Overman I*, the "level of intent necessary to justify punitive damages" is higher than the level of intent embodied in the term "willful" in § 392.350, supra, to support an award of attorney's fees. *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 548–49; and *Overman I*, supra, 675 S.W.2d at 422–23. In drawing this distinction, the court in *De Paul*, quoting from *Warner v. Southwestern Bell Telephone Company*, 428 S.W.2d 596, 603 (Mo.1968), and requoted with approval in *Overman I*, explicated the higher level of intent necessary to justify punitive damages as follows: " 'The acts of the defendant which justify the imposition of punitive damages are those which are willful, wanton, malicious or so reckless as to be in utter disregard of the consequences. Such acts are clearly distinguished from negligence. While they need not always include an intent to do harm, they must show such a conscious disregard for another's rights *as to amount to willful and intentional wrongdoing.*' '' (emphasis added) *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 548; and *Overman I*, supra, 675 S.W.2d at 422–23.

Analysis of submissibility of punitive damages in the instant case vis-a-vis the

appeal on that ground but may raise the same on the other party's appeal."

guidelines drawn in *Overman I*, which may aptly be referred to as the law of the case by virtue of the prior appeal, is purely speculatory without first ascertaining the level or degree of malice reflected by said guidelines. *Sanders v. Daniel Intern. Corp.*, 682 S.W.2d 803 (Mo. banc 1984), is instructive in undertaking this task. In *Sanders,* the court was confronted with the meaning of the term "malicious" in a malicious prosecution case, and, as well, with the meaning of the term "malicious" in the context of punitive damages in a malicious prosecution case. In a comprehensive opinion by Welliver, J., the court historically reviewed and differentiated the three degrees or levels of malice which have long permeated the law. The three degrees or levels of malice reviewed and differentiated in *Sanders* are now set forth in descending order. One, *malice in fact* (sometimes referred to as actual malice) means " 'ill-will, spite, personal hatred, or vindictive motives ... [and] is evidenced by an attempt to vex, injure or annoy another.' " *Id.,* 807. Second, *malice in its legal sense,* "embraces any improper or wrongful motive—that is, *malo animo* ",[3] *Id.,* 807, or, as sometimes more extensively defined, " 'simply ... a general wickedness or intent on the part of a person; a depraved inclination to do harm, or to disregard the rights or safety of mankind generally.' ", *Id.,* 807–08. Third, *malice in law* (sometimes referred to as legal malice) is "properly defined as a wrongful act done intentionally without just cause or excuse." *Id.,* 808. As explicitly observed in *Sanders,* malice in law "rests upon a legal presumption independent of any proof concerning defendant's mental state", while malice in the legal sense "requires either direct or indirect proof of a mental state somewhat less culpable than malice in fact." *Id.,* 808. Historically, malice in law sprang up as a " 'cloak for strict liability' " in suits for defamation, false arrest and imprisonment, *Id.,* 811, and was a mere legal fiction resting upon a legal presumption independent of any proof as to a party's actual mental

state, *Id.,* 808. Unfortunately, malice in law has been variously referred to as the applicable degree of malice in a broad spectrum of punitive damage claims having nothing in common with the concept of throwing a protective cloak around cases of strict liability, when, in fact, a higher level or degree of malice appears to have been applied. For example, in *Stark v. American Bakeries,* 647 S.W.2d 119, 123 (Mo. banc 1983), the court, after referring to malice in law, went on to say that "[t]o be assessed punitive damages, defendant must not only have intended to perform the act which is ascertained to be wrongful *but must have known it was wrongful when he did it."* (emphasis added) See also *Warner v. Southwestern Bell Telephone Company,* supra, 428 S.W.2d at 603.

As measured by the three levels or degrees of malice explicated in *Sanders,* certain conclusions are inevitable. For all practical purposes, "willful" in the context of § 392.350, supra, as a basis for awarding attorney's fees in the type of action at hand, i.e., doing something "intentionally" knowing it was "incorrect", or doing something without a "reasonable basis" for doing so, virtually parallels the classic definition of malice in law, i.e., "a wrongful act done intentionally without just cause or excuse." See generally: *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company,* supra, 539 S.W.2d at 549; *Overman I,* supra, 675 S.W.2d at 423; and *Sanders v. Daniel Intern. Corp.,* supra, 682 S.W.2d at 808. Any distinction between intentionally doing something knowing it was "incorrect" or without a "reasonable basis", and doing a "wrongful act intentionally without just cause or excuse", is so infinitesimal as to be indiscernible. Syllogistically, as the level of intent necessary to support the submission of punitive damages in this case is higher or greater than is required to support an award of attorney's fees, then it inexorably follows that the degree or level of malice required to support the submission of puni-

---

**3.** Malo animo, is defined in Black's Law Dictionary (5th Ed.) as follows: "With an evil mind; with a bad purpose or wrongful intention; with malice."

tive damages, consistent with the guidelines set forth and drawn in *Overman I,* supra, more closely parallels *malice in the legal sense,* rather than *malice in law.* See *Overman I,* supra, 675 S.W.2d at 422–23; and *Sanders v. Daniel Intern. Corp.,* supra, 682 S.W.2d at 815.

Attention now focuses on Bell's first point on appeal—insufficiency of the evidence to warrant submission of punitive damages. It is appropriate to be reminded that "[i]n determining the sufficiency of the evidence to support a submission of punitive damages, the evidence is to be viewed in the light most favorable to the plaintiff and all favorable inferences favorable to the submission are to be considered." *Deck and Decker Personnel, Etc. v. Thomas,* 623 S.W.2d 90, 92 (Mo.App. 1981). It is axiomatic, however, that this tightly circumscribed review of the evidence at the appellate level must be juxtaposed with the requisite level or standard of malice to support an award of punitive damages.

A broad overview of certain "background" events is essential to put the ultimate issue of submissibility in proper perspective. On July 19, 1963, Bell filed, and the Public Service Commission approved, General Exchange Tariff, Section 7.3.5 pertaining to directory listings: "No name or phrase will be listed which in the opinion of the Telephone Company is likely to mislead or deceive the public. No name, whether actual or assumed, or phrase will be listed when in the opinion of the Telephone Company the name or phrase is requested for advertising purposes or to gain a special position or prominence in the directory; ...". Due to an unbridled proliferation of directory listings, deemed misleading to the public and chosen to gain a special position or prominence in the directories, particularly "A" prefix and multiple "A" listings, along with attendant difficulties in alphabetizing the directories, Bell initiated a statewide "clean-up" campaign in the spring of 1973, prior to publication of its 1974 directories, to implement General Exchange Tariff, Section 7.3.5, supra. Due to the vast scope of the problem sought to be alleviat-

ed, the "clean-up" campaign was first directed toward the listing classification of plumbing and sewer services, which Bell determined was the most flagrantly abused classification. Pursuant thereto, representatives of Bell during the late summer of 1973 contacted some sixteen or eighteen businesses with listings in the plumbing and sewer classification deemed violative of General Exchange Tariff, Section 7.3.5, supra. Accordingly, a representative of Bell contacted Overman and advised him that the name "AAA Plumbing Co." would no longer be accepted for directory listing, and suggested an alternative listing of "Overman AAA Plumbing Co." which was rejected by Overman. Overman refused to submit an acceptable alternative listing and "AAA Plumbing Co." was deleted from Bell's "Yellow" and "White" pages directories, and directory assistance, during 1974, 1975, 1976 and 1977. In 1975, 1976 and 1977 Bell, on its own initiative, listed Overman and Massey's business number in the "White" pages directory as "Overman, C.E. Plumbing." "AAA Plumbing Co." was not singled out in 1973 as the only plumbing business with an objectionable "A" prefix or multiple "A" listing. To the contrary, as previously noted, some sixteen or eighteen other plumbing and sewer listings determined to constitute objectionable "A" prefix or multiple "A" listings in the Greater Kansas City directory were contacted and acceptable listings were successfully negotiated with them.

Historically, Overman formed a partnership in 1947 with two of his brothers-in-law and engaged in the plumbing business under the name "AAA Plumbing Co." The name "AAA Plumbing Co." was initially chosen in order to appear "near the front" of the plumbing and sewer classification listings in the "Yellow Pages", and the three A's in the name "AAA Plumbing Co." were neither an acronym nor initials of a given proper name. Thereafter, until 1961, with the exception of a period of one year, Overman in partnership, or as a sole proprietorship did business under the name "AAA Plumbing Co." In 1961 Overman

founded a partnership with Massey, d/b/a AAA Plumbing Co. and the two adopted the name and directory listing of "AAA Plumbing Co." and did business under that name thereafter. The business listed as "AAA Plumbing Co." was neither incorporated nor registered as a fictitious name at the time or times in question. However, the partnership used the name "AAA Plumbing Co." on its stationery, statements, trucks, business cards, bank accounts and licenses.

In February, 1974, Bell promulgated an inter-company directive captioned General Directory Circular 37 which was a compilation of policy considerations developed up to that date to implement General Exchange Tariff, Section 7.3.5. General Directory Circular 37, after reciting a portion of an earlier "Business Office Practice" procedure to the effect "that the name by which a customer is known to the general public or the name under which a customer regularly conducts business is the principal governing factor in determining the acceptability of a name to be shown in a listing," then proceeded to establish additional factors to be considered when determining the acceptability of a listing "beginning with an initial or initials, when the name appears to be designed for alphabetical preference." General Directory Circular 37, under the caption "Listing Guidelines", advised that even though it was determined that an alleged firm name was, in fact, the name under which a customer conducted business, the listing should be refused if, in the opinion of Bell, the listing was (a) "vulgar, obscene or otherwise offensive to the public" or (b) "misleading to users of the directory", or (c) "likely to misdirect calls", or (d) "designed to gain alphabetical preference." Moreover, if a listing appeared objectionable from one or more of the standpoints just mentioned, other factors to be considered would include (a) whether it was the only name, other than a given or proper name, by which the customer regularly conducts his business, (b) whether the customer recently changed to or added the listing for a justifiable reason, (c) whether the listing and others similar to it, tend to

make the directory confusing to users, (d) whether acceptance of the listing would constitute unfair competition to other listed firms offering the same goods or service, and (e) whether acceptance of the listing would in any way inhibit users of the directory from knowing exactly which firm was being represented.

Notwithstanding the aforementioned, General Directory Circular 37 also contained certain express provisos, to-wit, that "[m]ultiple 'A's' at the beginning of a listing are not to be accepted unless they are proven to be an acronym," and that "[l]istings preceded by a single letter are not to be accepted unless the letter is a given proper name or initial." Moreover, the "Business Office Procedure", referred to in General Directory Circular 37, dated October 1, 1968, and which was in force at all times in question, further provided: "Do not accept any listing which appears to be requested for advertising purposes or is designed to give special prominence or obtain precedence in the alphabetizing of the White Pages or Yellow Pages directories even though it meets all or some of the requirements above." General Directory Circular 37 was withdrawn by Bell in September, 1976, and supplemented by a new policy in 1977. The details or content of the new policy are not disclosed in the record.

On April 4, 1977, Overman and Massey filed a complaint against Bell with the Missouri Public Service Commission regarding exclusion of their listing of "AAA Plumbing Co." from the "Yellow" and "White" pages directories, and directory assistance, in 1974, 1975, 1976 and 1977. Their complaint before the Commission was posited on § 392.200.3, RSMo 1978, which provides, inter alia, that "[n]o telegraph corporation or telephone corporation shall make or give any undue or unreasonable preference or advantage to any person, corporation or locality, or subject any particular person, corporation or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; ...." The Report and Order of the Commission, effec-

tive July 7, 1978, became final on November 16, 1979, when it was affirmed on judicial review by the Circuit Court of Cole County from which no appeal was taken. By its Report and Order, the Commission ordered Bell to accept Overman and Massey's listing of "AAA Plumbing Co." in all future directories and directory assistance. This order reflected the Commission's conclusion that Bell had no "reasonable foundation to form its opinion in 1973 and subsequent years that the Complainant's [Overman and Massey] name was 'requested ... to gain a special position of prominence in the directory' ", thereby violating § 392.-200.3, supra. The Commission's conclusion, factually speaking, rested on its finding that if Bell had perused prior directories it would have known that "AAA Plumbing Co." was the name under which Overman and Massey had regularly conducted business since 1961, and, moreover, that Bell's representatives were unaware, when they excluded the "AAA Plumbing Co." listing, that the name had been initially selected to gain a special position or prominence in Bell's directories.

In order to determine submissibility of punitive damages, in this case, a plethora of evidence, in the light most favorable to Overman and Massey, must now be plumbed within the broad parameters of the general overview of the case heretofore set forth. Furthermore, having concluded that *malice in the legal sense* is the requisite level or degree of malice necessary to support submission of punitive damages in this case, it is incumbent upon this court to measure submissibility in accordance with the same criterion.

Overman and Massey, in their brief on appeal, have exhaustively delineated a number of evidentiary matters which they claim are particularly germane to and supportive of their position that they made a submissible case for punitive damages. An independent review of the record by this court demonstrates that the evidentiary matters stressed by Overman and Massey are, from their standpoint, the fulcrum of the admittedly difficult task of appellate determination of whether a submissible

case of punitive damages was made. Consequently, the evidentiary matters which Overman and Massey emphasize and rely on will be seriately set forth and discussed.

■ Overman and Massey vigorously contend that the Report and Order of the Public Service Commission, supra, which was admitted as an exhibit and read in full to the jury by one of Overman and Massey's attorneys who was called as a witness on their behalf and also actively participated in the trial, all over the objection of Bell (which is the subject of a separate point on appeal), in and of itself supported the submission of punitive damages. Certain language in the Report and Order of the Commission, to-wit, that Bell's exclusion of "AAA Plumbing Co." from its directories and directory assistance was "arbitrary, unreasonable and capricious," is particularly emphasized by Overman and Massey. The Report and Order of the Commission, and the particular language selected for emphasis, has no credence whatsoever in determining whether Bell acted with the requisite degree of malice to support the submission of punitive damages. Admittedly, primary jurisdiction was exclusively vested in the Public Service Commission to initially determine whether Bell's exclusion of the listing of "AAA Plumbing Co." from its directories and directory assistance constituted a violation of § 392.200.3, supra. The jurisdiction of the Public Service Commission, however, was limited as circumscribed by § 392.200.3, supra, and it lacked jurisdiction to entertain or determine damages, compensatory or punitive, as such matters are within the sole and exclusive jurisdiction of the courts in statutory actions brought pursuant to § 392.350, supra. See generally: *Wilshire Construction Co. v. Union Electric Co.*, 463 S.W.2d 903, 905 (Mo. banc 1971); and *De Maranville v. Fee Fee Trunk Sewer, Inc.*, 573 S.W.2d 674 (Mo.App.1978). A final order by the Public Service Commission that an act or omission is in violation of § 392.200.3, supra, is, however, a condition precedent to filing a statutory action under § 392.350, supra. See generally, *De Maranville v. Fee Fee Trunk*

*Sewer, Inc.,* supra. Even though the Report and Order of the Public Service Commission was admissible for the limited purpose of showing that the Public Service Commission found that there had been a violation of § 392.200.3, supra, it had no probative value regarding the nature and amount of damages, was totally irrelevant and highly prejudicial with respect thereto, and was inadmissible regarding the issue of punitive damages. Its admission for the limited purpose of showing a violation of § 392.200.3, supra, was obviated by the fact that Bell admitted on the record before the trial commenced that the Public Service Commission, by its Report and Order effective July 7, 1978, found that Bell's exclusion of "AAA Plumbing Co." was in violation of § 392.200.3, supra, thus satisfying the condition precedent to the filing of Overman and Massey's statutory cause of action pursuant to § 392.200, supra.

■ The particular language in the Report and Order of the Commission stressed by Overman and Massey, that exclusion of "AAA Plumbing Co." by Bell was "arbitrary, unreasonable and capricious", in the sense of causation or motivation, was blatantly prejudicial as it was highly susceptible of falsely conveying to the jurors who tried the case that the Public Service Commission found that Bell's exclusion of the listing of "AAA Plumbing Co." was motivated by spite, hatred and ill-will. The decisional jurisdiction of the Public Service Commission was limited to finding whether the exclusion *resulted* in subjecting Overman and Massey "to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." Section 392.200.3, supra. "Undue or unreasonable prejudice or disadvantage" in the context of § 392.200.3, supra, connotes result or effect rather than causation or motivation. Application of a tariff by a utility could be "undue" or "unreasonable" under § 392.200.3, supra, even though based on the purest of motives or total unawareness of attendant relevant facts. Our Supreme Court has consistently adhered to the rule or principle that the Public Service Commission is a body of limited jurisdiction and has only such powers as are conferred upon it by statute, and such incidental powers as may be necessary to enable it to exercise its statutorily granted powers. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission of Missouri,* 585 S.W.2d 41, 49 (Mo. banc 1979); and *State ex rel. City of West Plains v. Public Service Commission of Missouri,* 310 S.W.2d 925, 928 (Mo. banc 1958). The Public Service Commission transgressed its statutory authority when it undertook to pass judgment on what it believed motivated Bell in excluding the "AAA Plumbing Co." listing. The statutory authority of the Public Service Commission was limited to determining whether exclusion effected or resulted in any "undue or unreasonable prejudice or disadvantage" to Overman and Massey. Perforce, it was beyond the jurisdictional province of the Public Service Commission to entertain or render judgment as to what *motivated* Bell to exclude the "AAA Plumbing Co." listing as it purportedly attempted to do by stating in its Report and Order that Bell's action in doing so was "arbitrary, unreasonable and capricious." For reasons stated, the Report and Order of the Public Service Commission was totally devoid of any probative value on the issue of punitive damages.

■ The fact that Bell alternatively asserted on appeal (Point II) that the trial court erred in refusing to grant it a new trial or order a remittitur of $9,900,000.00 because the verdict of Ten Million Dollars ($10,000,000.00) was "so grossly excessive as to be the product of bias and prejudice" is characterized by Overman and Massey as an "admission" by Bell that its conduct was "willful, wanton and malicious." Neither logic nor law support this novel position. It is well established that alternative pleadings do not possess the inherent characteristics of admissions and may not be used as an admission upon another issue in the same case. *Macheca v. Fowler,* 412 S.W.2d 462 (Mo.1967). A direct analogy between alternative pleadings and alternative points asserted on appeal may appropriately be drawn, thereby bringing the

latter within the general rule just mentioned. Similarly, "legal conclusions may not be relied upon as admissions." *Id.*, at 465. To accede to Overman and Massey's argument would be tantamount to grouping legal conclusions and admissions in the same category.

Evidence of Bell's cancellation of General Directory Circular 37 in September, 1976 and adoption of a new policy in May, 1977 which would have permitted the controversial listing in 1978, coupled with exclusion of the listing in the 1977 directories and directory assistance, is pointed out by Overman and Massey as proof of malice on the part of Bell. The frailty of this argument lies in the fact that the record falls considerably short of disclosing complete details of the new policy, and, more importantly, fails to disclose that a decision had been made to implement the new policy in time to meet the publication deadlines for the 1977 directories. Moreover, the record discloses that Bell in fact included the "AAA Plumbing Co." listing in the 1978 directories and directory assistance before the Public Service Commission issued its order dated June 22, 1978, directing Bell to include the "AAA Plumbing Co." listing in its future directories and directory assistance service.

Overman and Massey, by way of laying a foundation for their next argument in support of their claim for punitive damages, pursue the following course: They start out by stating in their brief that regarding the "clean-up" campaign initiated in 1973, "an oral policy was developed, later put into writing in Bell's Circular 37, whereby 'A' prefix companies (except A–1) and multiple A companies were to be excluded unless the A's stood for the initials of the proprietor or partners or was an acronym." Next, that Bell's manager of Yellow Pages sales in the Kansas City area was advised in the summer of 1973 by one of his supervisors that sixteen or eighteen plumbing and sewer listings, including "AAA Plumbing Co.", were deemed to be in violation of General Exchange Tariff, Section 7.3.5, supra, and, insofar as relative to the instant case, the "AAA Plumbing Co." listing was unacceptable unless the A's in "AAA Plumbing Co." stood for the initials of the proprietor or partners, or was an acronym. Overman advised Bell's manager of "Yellow Pages" sales that "the AAA does not stand for anything except my business." Overman was neither asked about the name he did business under, nor how long he had used the name "AAA Plumbing Co." Upon being advised that the "AAA Plumbing Co." listing was unacceptable, Overman refused to consider an alternative listing. If correctly perceived, Overman and Massey juxtapose the above with certain testimony adduced on cross-examination from one of Bell's executive level employees who participated in the decision to exclude the "AAA Plumbing Co." listing. Namely, that with respect to the "AAA Plumbing Co." listing, he had no first hand knowledge that the listing was misleading to users of the directories, or that it was likely to misdirect calls, or that it was designed to give alphabetical preference, and admitted that the name was not vulgar, obscene or otherwise offensive. Using the aforementioned as a foundation, Overman and Massey argue that Bell's exclusion of "AAA Plumbing Co." from its directories was inconsistent with General Exchange Tariff, Section 7.3.5, supra, and certain guidelines subsequently reflected in General Directory Circular 37, thereby evidencing willful, wanton and malicious misconduct on Bell's part.

In advancing the above-mentioned argument, Overman and Massey conveniently ignore certain positive provisos in General Directory Circular 37 to the effect that multiple A's at the beginning of a listing were unacceptable unless they were proven to be an acronym or stood for the initials of a proprietor or partners of a business, as well as Overman's admission that the multiple A's were neither an acronym nor initials of the partners. Admittedly, some of the provisions of General Directory Circular 37 appear to overlap, or are arguably inconsistent or contradictory. Be that as it may, any overlapping, inconsistencies or contradictions do not bespeak of a carefully

conceived ruse or plan to surreptitiously single out a particular listing for exclusion. Moreover, the broad, sweeping language of General Exchange Tariff, Section 7.3.5, supra, which by statute, § 386.270, RSMo 1978, is presumed "prima facie lawful and reasonable until found otherwise in a suit brought for that purpose,"[4] vested Bell with broad discretion and latitude in determining whether a name was unacceptable for directory listing on the grounds that it was requested "for advertising purposes or to gain a special position or prominence in the directory." In view of the problems which triggered the "clean-up" campaign, a name containing multiple A's at the beginning, which were neither an acronym nor initials of a proprietor or partners, patently evidenced a name selected for advertising purposes or for purposes of gaining a special position or prominence in a directory, and the positive proviso in General Directory Circular 37 that such listings should not be accepted appear to bear the imprimatur of General Exchange Tariff, Section 7.3.5.

According to Overman and Massey, certain listings accepted in the plumbing and sewer classifications of the 1974, 1975, 1976 and 1977 "Yellow Pages" directories, as well as certain multiple "A" listings in the 1974, 1975, 1976 and 1977 "White Pages" directories, were, on their face, violative of policies implementing the "clean-up" campaign. The thrust of this argument advanced by Overman and Massey, if correctly perceived, being that certain facially suspect listings which were not excluded demonstrated, ipso facto, that Bell's exclusion of "AAA Plumbing Co." was motivated by the requisite degree of malice to support punitive damages. This argument, with one exception hereinafter noted, is devoid of any evidentiary support, e.g., that the facially suspect listings were not acronyms or initials of a person or partners, that they did not comport with other policy criterion making them acceptable, or, more importantly, that their inclusion was prompted or motivated by a sense of malice

leveled solely towards Overman and Massey. The argument also obfuscates the fact that the "clean-up" campaign, due to its vast scope and size, was implemented in stages, starting initially with the classification of plumbing and sewer listings, since the latter presented the most glaring and flagrant use of what appeared to be carefully couched names to secure "a special position or prominence" in the directories. Moreover, the argument overlooks some sixteen plumbing and sewer listings which were deemed objectionable by Bell during the time frame that Overman was contacted which were voluntarily changed by the respective proprietors to bring them in conformity with the "clean-up" campaign undertaken by Bell. If Bell had capitulated to Overman and Massey's unyielding refusal to negotiate a different listing, it would have been the antithesis of a fair and impartial implementation of its "clean-up" campaign. Admittedly, AAA Dee Rooter Service (the one exception previously mentioned) fell through the sieve of the "clean-up" campaign and improperly appeared in the 1974 and 1975 "White Pages" directories. Other than the two occasions mentioned, it, too, was excluded. There is not a scintilla of evidence that the listing of AAA Dee Rooter Service on the two occasions mentioned was anything more than an inadvertent mistake. Moreover, there is not a scintilla of evidence that inclusion of any of the facially suspect listings delineated by Overman and Massey, viewed either singularly or collectively, emanated from such a "conscious" disregard of Overman and Massey's rights as to constitute a "willful and intentional wrongdoing" perpetrated against them. *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 548; and *Overman I*, supra, 675 S.W.2d at 422–23.

Bell's disregard of the adverse economic impact resulting from deletion of the listing of "AAA Plumbing Co." is advanced by

---

**4.** No suit was ever brought attacking General Exchange Tariff 7.3.5—hence, it stands as being

"prima facie lawful and reasonable."

Overman and Massey as characterizing Bell's conduct as willful, wanton and malicious. The adverse economic impact is posited on the "sales pitch", i.e., economic benefit, inherent in the media advertising campaign engaged in by Bell to promote its "Yellow Pages" directory service. If potential economic impact had been an ultimate controlling criterion in deciding whether to exclude a listing deemed in violation of the policies implementing the "clean-up" campaign, then the "clean-up" campaign pursuant to General Exchange Tariff, Section 7.3.5, would have been inert at the outset. Contrary to Overman and Massey's argument, adverse economic impact was a potential result rather than a motivating factor for excluding "AAA Plumbing Co." Their argument improperly equates potential result with state of mind, and is logically untenable.

A former employee of Bell,[5] who appeared as its only witness at the hearing before the Public Service Commission in September of 1977, was called as a witness by Overman and Massey during the trial of this case. As reflected by the record, this witness was ostensibly called by Overman and Massey under the adverse witness rule, and Bell did not object to his being called in that posture. During the course of redirect examination, this witness confirmed that due to a change in policy by Bell "during the year 1977," the "change in policy then allowed AAA Plumbing Company to go back in the 1978 directories." The change in policy was otherwise unexplained, and the record is silent as to any details or specifics of the "new policy". Moreover, the record is silent as to when Bell determined that the "AAA Plumbing Co." listing was acceptable under the "new policy". Immediately thereafter, this witness was further asked on redirect examination if he remembered giving the following "answer" when he testified before the Public Service Commission on September 1, 1977: " 'With the end of solicitation, October 14th of this year, for the Kansas City book that is going to be published in January of '78, all of the A listings will be out if we continue this program'." The "answer" which this witness was asked about was not preceded by the question to which it purportedly responded. Absent knowledge of the context of the question which the "answer" responded to, any conclusions drawn from it are speculatory. The witness, responded as follows when asked on redirect if he gave the above "answer" when he testified before the Public Service Commission: " '77 would have been the time that we started the policy. For the Kansas City '78 book, it would have had to conform to the new '77 policy." After giving the answer just mentioned, the witness was then asked the following question on redirect examination. "All right. Was the question asked you, 'So, are you telling me that all other categories with, or when you experienced this multiple A listing problem, by the time you published your next book in January, you will have corrected, in your mind, this problem in the Kansas City directory?' " The following answer was given by the witness: "There would have been an attempt made to get the A listings conformed to the new policy." Pressed further for his answer to the question put to him before the Public Service Commission the witness was asked: "You can explain your answer, but was your answer, 'all of the classifications, yes'?" to which the witness replied, "Yes, that—all the classifications." Overman and Massey contend that the aforementioned line of questioning of this witness during the trial of this case demonstrates that Bell was engaged in an insidious "cover up" during the hearing before the Public Service Commission to prevent the Commission from learning that its previous policy implementing its "clean-up" campaign had been changed and supplemented by a new policy which permitted the listing of "AAA Plumbing Co." in the 1978 directories. The explanation given by the witness during the course of this continuing line of questioning on redirect examination dispels rather than aids the connotation Overman and Massey seek to

5. At the time of the trial the witness was employed by a subsidiary of Bell.

draw, and was binding on them as it was the only evidence presented to the jury on the subject. *Taylor v. Riddle*, 384 S.W.2d 569, 573–74 (Mo.1964). Concomitantly, implementation of the "clean-up" campaign as it existed prior to adoption of the new policy was the issue before the Public Service Commission.

By way of recapitulation, the crux of the degree or level of malice necessary to support an award of punitive damages in an action under § 392.350, supra, is appropriately summed up as "such a conscious disregard for another's rights 'as to amount to willful and intentional wrongdoing.'" *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 548; and *Overman I*, supra, 675 S.W.2d at 422–23. The aforementioned requires a higher level of intent than "willful" as used in § 392.350, supra, to support an award of attorney's fees. *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 548–49; and *Overman I*, supra, 675 S.W.2d at 422–23. "Willful" in the context of § 392.350, supra, as defined in *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 549, when pragmatically viewed, parallels malice in law, to-wit, "a wrongful act done intentionally without just cause or excuse." Since the degree or level of malice required to support an award of punitive damages under § 392.350, supra, requires a higher level of intent than "willful" to support an award of attorney's fees under § 392.350, supra, logic and the process of elimination dictate that *malice in the legal sense*, next in ascending order of levels or degrees of malice, is the *test for determining submissibility* of punitive damages in this case. Malice in the legal sense embraces an "improper or wrongful motive—that is, *malo animo*." *Sanders v. Daniel Intern. Corp.*, supra, 682 S.W.2d at 807. Conduct which amounts to "willful and intentional wrongdoing" bespeaks of malo animo as opposed to an act done without "just cause or excuse." Although the distinction between legal malice and malice in the legal sense may appear so subtle at first blush as to be virtually indiscernible, it is placed in sharper focus when addressed in terms of proof—legal malice is a legal fiction requiring no proof of state of mind while malice in the legal sense requires either direct or indirect proof of malo animo. *Sanders v. Daniel Intern. Corp.*, supra, 682 S.W.2d at 808.

The evidence in this case, viewed in the light most favorable to Overman and Massey, falls legally short of direct or indirect proof that Bell's exclusion of "AAA Plumbing Co." from its directories during the years in question constituted conduct equatable with malice in the legal sense. The "clean-up" policy was neither instigated nor carried out by Bell with intent to single out "AAA Plumbing Co." for exclusion from its directories. Neither was it instituted out of " 'a general wickedness or intent on the part of [Bell] … [or] a depraved inclination to do harm or to disregard the rights or safety of mankind generally.'" *Sanders v. Daniel Intern. Corp.*, supra, 682 S.W.2d at 807–08. To the contrary, it was initiated and carried out to rectify what Bell, in its considerate judgment, concluded was a widespread abuse of directory listings chosen to gain a "special position or prominence" in the directories. General Exchange Tariff Section 7.3.5. A proliferation of multiple "A" listings pointed up the magnitude of the problem facing Bell. The fact that Bell, during the time in question, negotiated new listings with approximately sixteen other businesses in the plumbing and sewer classification deemed violative of the policies implementing the "clean-up" campaign augurs against any contention that "AAA Plumbing Co." was singled out for special treatment. Moreover, if the "AAA Plumbing Co." listing had been accepted when some sixteen other businesses were required to submit new listings, application of the policies formulated in connection with the "clean-up" campaign would have been highly suspect from the standpoint of implementing the "clean-up" campaign in a fair and impartial manner. The "clean-up"

campaign undertaken by Bell, due to the nature and scope of the problems sought to be alleviated, necessarily required a number of policy factors or considerations to be weighed and balanced in determining whether a particular multiple "A" listing was acceptable or unacceptable. It was not an easy campaign to conduct as it involved the exercise of considerable discretion and judgment on the part of those charged with carrying it out. Second-guessing Bell's exercise of discretion and judgment, by way of hindsight, does not prove, ipso facto, that Bell's judgmental decision was induced by a state of mind legally characterized as malo animo. It is well established that a duty rests on a party-plaintiff to make a submissible case by substantial evidence of probative force and to remove the case from the legally infirm status of speculation, conjecture and surmise. *Zeigenbein v. Thornberry*, 401 S.W.2d 389, 393 (Mo.1966); *Probst v. Seyer*, 353 S.W.2d 798, 802 (Mo.1962); and *Rossmann v. G.F.C. Corporation of Missouri*, 596 S.W.2d 469, 472 (Mo.App.1980). This court is constrained to hold that under the applicable level or degree of malice (malice in the legal sense) there was no substantial evidence of probative force to support Overman and Massey's claim for punitive damages, and the verdict below for punitive damages in their favor, even after remittitur, cannot be shored up by resort to the flimsy props of speculation, conjecture and surmise.

■ Bell also contends on appeal that the trial court erred in awarding attorney's fees in the amount of $139,299.85 to be taxed as costs against it because there was "no credible evidence" that its actions were "willful" within the meaning of § 392.350, supra. The award of attorney's fees is not questioned by Bell on any ground other than the one just mentioned. The standard of appellate review in this instance, i.e., the sufficiency of the evidence to support a finding that Bell's action was "willful" within the meaning of § 392.350, supra, differs from that regarding submissibility of punitive damages. Since the issue of attorney's fees was tried to the court rath-er than to the jury, the applicable standard of appellate review of the narrow issue of the sufficiency of the evidence raised by Bell is that laid down in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976): "[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law."

■ In *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company*, supra, 539 S.W.2d at 549, the court defined "willful" as used in § 392.-350, supra, to support an award of attorney's fees, in the following terms: "We hold that in the context of rate discrimination, 'willful' means either intentionally charging an incorrect rate knowing it was incorrect, or charging a rate when the utility has no reasonable basis for placing the independent consumer within the classification calling for that rate." Extrapolation of this definition, in the context of the case sub judice, renders the following definition: "Willful" means either intentionally excluding "AAA Plumbing Co." from directory listing knowing it was "incorrect" to do so, or excluding "AAA Plumbing Co." from directory listing when there was no "reasonable basis" for doing so. The record, as a whole, fails to support a finding that Bell intentionally excluded "AAA Plumbing Co." from directory listing knowing it was incorrect to do so. Hence, the first portion of the extrapolated definition of "willful" is inapplicable under the evidence disclosed by the record. Applicability of the second portion of the extrapolated definition—excluding "AAA Plumbing Co." from directory listing without a "reasonable basis" for doing so—presents a closer question. At the outset, it should be noted that whether Bell excluded "AAA Plumbing Co." from directory listing without a reasonable basis for doing so is measured by a less stringent standard than the level or degree of malice required to support the submission of punitive damages. The term "willful"

contained in § 392.350, supra, as defined in *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company,* supra, 539 S.W.2d 549, does not require proof of a state of mind epitomizing malo animo. Whether a reasonable basis existed for excluding "AAA Plumbing Co." from directory listing must be measured against the broad authority vested in Bell by General Exchange Tariff, Section 7.3.5, supra, and the policy factors and criteria it promulgated to implement said tariff provision. At this juncture, it is important to note that neither General Exchange Tariff, Section 7.3.5, supra, nor the factors and criteria promulgated by Bell for its implementation have ever been challenged or struck down. Nevertheless, if Bell, in exercising its discretion and judgment, however well intentioned, weighted certain factors or criteria at the expense of others, or minimized the applicability of certain factors or criteria, such posed a factual issue for the trier of facts as to whether Bell had a reasonable basis for doing what it did. Concomitantly, the record discloses evidence from which the trier of facts could find that Bell's employees, when the decision was made to exclude "AAA Plumbing Co." from directory listings, were unaware as to the length of time Overman and Massey had used "AAA Plumbing Co." as their business name, and, moreover, that the name had been selected as their business name before General Exchange Tariff, Section 7.3.5, supra, was filed by Bell and approved by the Public Service Commission. Under the scope or standard of appellate review mandated by *Murphy v. Carron,* supra, it cannot be said that the trial court erred in awarding attorney's fees on the ground that Bell's conduct was "willful" within the meaning of the term as used in § 392.350, supra. Parenthetically, as noted in *De Paul Hospital School of Nursing v. Southwestern Bell Telephone Company,* supra, 539 S.W.2d at 549, and quoted with approval in *Overman I,* supra, 675 S.W.2d at 423, a "consumer is greatly overmatched by the expertise, legal staff and resources of the utility". To alleviate this patent disparity between consumer and utility

when the former challenges application of a tariff in a given case, the legislature apparently saw fit to equalize their respective positions by providing for the recovery of attorney's fees on behalf of a successful consumer where no reasonable basis for the utility's action existed. The provision for attorney's fees in § 392.350, supra, as noted, advances a perceived public policy of placing consumers and utilities in parity regarding consumer access to the courts for redress of unreasonable applications of tariff provisions when accompanied by proof of willfulness within the meaning of the statute. The underlying concept of awarding attorney fees is not to monetarily benefit consumers but to prevent them from being disadvantaged by utilities, particularly in situations where the amount of recoverable damages is disproportionate to the legal costs of vindication. The highly visible disproportionality between the amount of compensatory damages and attorney's fees awarded in the instant case has not been questioned by Bell on appeal as it has not challenged the *amount* of attorney's fees awarded by the trial court. Moreover, time records and hourly rates introduced at the hearing on attorney's fees supported the *amount* awarded by the trial court. If Bell harbored a belief that the *amount* of attorney's fees awarded by the trial court was unreasonable, unsupported by the evidence, or potentially disproportionate, it should have raised and briefed such matters on appeal. The fact that Bell did not do so quells any inclination on the part of this court to sua sponte explore the *amount* of attorney's fees awarded by the trial court. In sum, there was substantial evidence to support the trial court's award of attorney's fees. This court reemphasizes that the *amount* of attorney's fees awarded by the trial court has not been challenged by Bell.

The majority of the point of error raised by Bell regarding the admissibility or exclusion of certain evidence relates solely to the issue of punitive damages. Having concluded that Overman and Massey failed to make a submissible case on the issue of

punitive damages, any evidentiary issues relating thereto have been rendered moot. Suffice it to say, particularly in view of the prolixity of the opinion to this point, those few which relate to or affect the issue of compensatory damages have been reviewed and found to be either meritless or non-prejudicial. Regarding instructional errors and improper closing argument raised by Bell, they also relate solely to the issue of punitive damages and have likewise been rendered moot.

Bell's charge of error posited on permitting one of Overman and Massey's attorneys, who actively participated in the trial of the case, to testify as a witness on their behalf does not justify reversal of the judgment in their favor for compensatory damages as the testimony adduced from such witness primarily, if not exclusively, affected the issue of punitive damages. Consequently, it is deemed unnecessary for disposition of this case to pass judgment, one way or the other, on the conduct of said attorney in actively participating both as a witness and an attorney on Overman and Massey's behalf during the trial of said case.

■ The only remaining point of error raised by Bell which might be said to affect the verdict returned in favor of Overman and Massey and against Bell for compensatory damages is that of alleged juror misconduct. The genesis of this point of error is some general questions put to the jury panel on voir dire by counsel for Bell. The questions may be generally paraphrased as follows: One, had any member of the panel ever had a dispute or disagreement with Bell which would prevent them from impartially trying the case? Two, had any member of the panel ever received a "bill" from Bell which they felt was improper or incorrect? None of the jurors affirmatively responded to the questions, either orally or by a show of hands. The first question was bifurcated—the first prong being whether any member of the panel ever had a dispute or disagreement with Bell, and the second prong being whether any dispute or disagreement, if in fact one occurred, would prevent them from impartially trying the case. This question was not broken down into two parts, i.e., whether any juror ever had a dispute or disagreement with Bell, and, if some jurors responded that they had, whether such would affect their impartiality to serve as jurors to try the case. Due to the bifurcated nature of the question, it is impossible to say whether the lack of response indicated concealment of a dispute or disagreement with Bell or, if one had occurred, that such did not prevent them from impartially trying the case. The question should have been separated into two parts, as indicated, in order to draw any definite or specific meaning from the jurors' failure to affirmatively respond, as the lack of affirmative response is susceptible of two different meanings. Regarding the second question, none of the jurors indicated that they ever received a bill from Bell which they felt was incorrect or improper. During post-trial proceedings Bell submitted evidence that three of the jurors selected to try the case had either received suspension notices or had their telephone service terminated by Bell for non-payment of their bills. The evidence just mentioned neither proved a dispute nor disagreement between any of the three jurors and Bell due to the bifurcated nature of the first question, nor proved the receipt of bills from Bell which any of the three jurors felt was incorrect or improper. It was incumbent upon Bell to prove that the three jurors *intentionally* concealed information relative to their qualifications to serve as jurors, determination of which, initially, rested in the sound discretion of the trial court. *Furlow v. Laclede Cab Company,* 502 S.W.2d 373, 376 (Mo.App. 1973); and *Blond v. Overesch,* 527 S.W.2d 663, 668–70 (Mo.App.1975). Due to the nature of the questions asked, and the inconclusive and assumptive nature of the evidence presented, Bell failed to prove any intentional concealment by either of the three jurors and the trial court did not abuse its discretion in holding that there was no juror misconduct.

Judgment in favor of Overman and Massey and against Bell in the amount of $1,625.00 for compensatory damages (Count I) and $139,299.58 for attorney's fees (Count III) is affirmed. Judgment in favor of Overman and Massey and against Bell in the amount of $5,000,000.00, or in any amount whatsoever, for punitive damages (Count II) is reversed.

Affirmed in part and reversed in part.

All concur.